### Eddie Mitchell TASBY, et al., Plaintiffs-Appellees,

v.

### BLACK COALITION TO MAXIMIZE EDUCATION, Intervenor-Appellant,

### Linus Wright, et al., Defendants-Appellees.

### No. 84–1442.

United States Court of Appeals, Fifth Circuit.

Sept. 20, 1985.

E. Brice Cunningham, Donald W. Hicks, Sr., Donald W. Hill, Dallas, Tex., for intervenor-appellant.

Strasburger & Price, Robert H. Thomas, P. Michael Jung, Dallas, Tex., for Wright.

Edward B. Cloutman, III, Dallas, Tex., for Tasby.

Before GEE, POLITZ and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge.

Before the Court today is another phase of the fifteen-year old Dallas school desegregation lawsuit. In its most recent ruling, the district court granted a motion by the Dallas Independent School District ("DISD") revising certain aspects of the 1976 desegregation order. The original plaintiffs supported the motion with some modifications. The Coalition to Maximize Black Education (the "Coalition"), intervenor in the suit, is the only party to appeal the court's ruling. More specifically, the Coalition requests that this Court remand for an evidentiary hearing on the DISD motion.

I.

This case was originally filed in 1970.[1] The first desegregation order, issued in 1971, was rejected by this Court as an inadequate remedy for disestablishing dual

---

**1.** We present here only the facts relevant to the issue now on appeal. For a complete recitation of the facts in this lawsuit see *Tasby v. Estes (Tasby II)*, 572 F.2d 1010 (5th Cir.1978), *cert.* *dismissed,* 444 U.S. 437, 100 S.Ct. 716, 62 L.Ed.2d 626 (1980); *Tasby v. Wright,* 520 F.Supp. 683 (N.D.Tex.1981).

schools in the DISD. *Tasby v. Estes*, 517 F.2d 92 (5th Cir.1975). In 1976, a new school desegregation plan was adopted by the district court.[2] *Tasby v. Estes*, 412 F.Supp. 1192 (N.D.Tex.1976). Intervenors NAACP challenged the student assignment portion of the new plan because of the large number of one-race schools established by it. The district court noted that a substantial shift in the demographic patterns of Dallas had caused the formerly majority anglo school system to become a predominantly minority one.[3] The court stated that because of this shift, the retention of some one-race schools in the desegregation plan might be justified.

On appeal, this Court reversed. We held that the District Court had not made specific findings as to the feasibility of the student assignment techniques as approved by the Supreme Court in *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) absent such findings, we were unable to review any plan that left many one-race schools in the system. The case was remanded with instructions to make such specific findings. *Tasby v. Estes (Tasby II)*, 572 F.2d 1010 (5th Cir.1978), *cert. dismissed*, 444 U.S. 437, 100 S.Ct. 716, 62 L.Ed.2d 626 (1980). On remand, the district court issued detailed findings, and concluded that while vestiges of state-imposed racial segregation remained in the DISD, additional *Swann* student assignments were not a feasible remedy for existing constitutional violations.[4] *Tasby v. Wright*, 520 F.Supp. 683 (N.D.Tex.1981).

In 1982, the DISD submitted a proposal to revise the 1976 decree. It consisted of a Minority Neighborhood Option Plan ("MNOP") to give minority students in grades 4 to 8 the option of staying in neighborhood centers by waiving their con-

stitutional right to be assigned and transported to a desegregated school. The plan was supported by the Coalition, and opposed by the NAACP. The district court rejected the plan, feeling constrained by the *Tasby II* remand order because such a plan would drastically affect the desegregation busing of grades 4 to 8. *Tasby v. Wright*, 542 F.Supp. 134 (N.D.Tex.1982). The parties were ordered to review the feeder patterns in effect for grades 4 to 8 throughout the DISD to determine if a revised pattern could be developed which would minimize the transportation dislocation of students. The court directed the parties to develop proposals to relieve overcrowding in schools without adversely affecting the present degree of desegregation.

The DISD appealed rejection of the MNOP plan, and the district court postponed the effective date for submission of the proposals until after the appeal was taken. On appeal, this Court held that the district court had not abused its discretion by refusing to approve the MNOP plan for grades 4 to 8. *Tasby v. Wright*, 713 F.2d 90 (5th Cir.1983). The case was again remanded and 1982 order was reinstated.

On January 30, 1984, the DISD submitted a Motion to Revise Feeder Patterns ("January 30 Motion"). The January 30 Motion proposed the re-opening of several schools in grades 4 to 8 in predominantly minority areas of south and west Dallas. The next day, the district court ordered counsel for plaintiffs and intervenors to file comments to the DISD proposal. Both the original plaintiffs and the Coalition filed comments opposing the motion.

The District Court then held a series of about fifteen conferences. In addition to the court, the DISD, the original plaintiffs,

---

**2.** The 1976 decree is currently in effect in the DISD.

**3.** In 1984, the DISD reported 127,324 students of whom 50% were black and 23% hispanic.

**4.** Assigning students to schools outside their neighborhoods in order to achieve greater racial balance throughout the school district was ap-

proved as a desegregation remedy in *Swann v. Charlotte-Mecklenburg Board of Education*. Plans detailing the assignment of students to particular schools are sometimes referred to as *Swann* student assignment plans. The term "feeder patterns" refers to the busing routes developed by a school district to transport students to their assigned schools.

and the Coalition took part. During the course of these negotiations, several documents were tendered to the court, including achievement data for black and anglo students in grades 4 to 6. No objections were made during the course of the negotiations as to the validity of these documents. The negotiations culminated in the filing by the DISD of a Motion to Establish South Dallas Educational Centers ("April 20 Motion").

The April 20 Motion proposed removing 2,300 minority students from the 1976 feeder patterns and returning them to neighborhood schools that would be remedial in nature. The plan was drawn to affect students only in grades 4 to 6 because recent achievement data indicated that the need for improvement, especially in the area of reading, was greatest in those grades. The district court directed that responses to the April 20 Motion be filed by April 26. During a series of conferences held after filing of the April 20 Motion, counsel for the Coalition indicated certain objections to the April 20 Motion, but those objections were never made part of the record. At some time during the negotiations, the district court asked whether a hearing would be necessary on the two pending motions. None of the parties requested a hearing.

The plaintiffs responded in support of the April 20 Motion, but no response was ever filed by the Coalition. On April 30, 1984, the district court entered an order granting with slight modifications the Motion to Establish South Dallas Educational Centers. It denied the DISD Motion to Revise Feeder Patterns.[5] *Tasby v. Wright,* 585 F.Supp. 453 (N.D.Tex.1984). The Coalition appealed, and filed a Motion to Stay the April 30 Order granting the Motion to Establish South Dallas Educational Centers. The Coalition alleged in its Motion to Stay that the district court had abused its discretion by not granting an evidentiary hearing on the April 20 Motion.

At the hearing on the Motion to Stay, the Coalition took the position that even though it never requested a hearing on the April 20 Motion, the court should have acted *sua sponte.* Counsel for the Coalition was asked by the court to identify disputed facts that would necessitate an evidentiary hearing on the April 20 Motion. The Coalition identified no disputed facts, and the Motion to Stay was denied. A Motion to Stay the April 30 Order was also denied by this Court.[6]

## II.

■ We first address the Coalition's contention that the district court's failure to grant an evidentiary hearing on the April 20 Motion constituted an abuse of discretion. As the district court pointed out in the hearing on the Coalition's Motion to Stay, such a hearing was never requested by the Coalition although the district court had specifically asked the parties during negotiations on the DISD motions whether such a hearing was necessary. In fact, no mention of a hearing was made by the Coalition until the issue was raised in its Motion to Stay. At the hearing on the Motion to Stay, the district court gave the Coalition the opportunity to present any disputed facts that might necessitate holding an evidentiary hearing on the April 20 Motion. The Coalition failed to identify any such facts. Given these circumstances, we do not accept the contention that the district court abused its discretion in any way by not granting an evidentiary hearing.

■ The Coalition also alleges that the district court should not have considered

---

5. The January 30 Motion also proposed removing students from the existing feeder patterns, but made no provision for remedial measures.

6. We note, as did the district court, that the position taken by the Coalition is to some extent inconsistent with the position it took three years ago when it supported the MNOP to return students to minority neighborhoods. The Coali-

tion was at that earlier time in favor of returning students to these schools without remedial measures. The April 20 Motion differs significantly from the MNOP in that it not only returns children to neighborhood centers, but additionally proposes specific remedial measures.

the documents submitted by the DISD in the January 30 and April 20 Motions in ruling on those motions because the documents were unverified and never properly put in evidence. Again, no objection had been made by the Coalition at the time the documents were presented to the court. The documents included statistical data on the capacity of physical facilities, student enrollment, the extent of transportation, and student test scores. The statistical data on achievement levels in grades 4 to 6 upon which the district court relied, were based on national-normed standardized tests. At all times, the parties had access to this information which formed the basis of the negotiations that followed the filing of the January 30 Motion.

The Coalition's request to exclude these documents from consideration without a formal offer of proof comes somewhat late in view of the fact that the Coalition had access to these documents throughout the negotiations and failed to voice any objection at that time. For the past few years, it has been the practice of all parties in the suit to utilize documents filed by the DISD without recourse to formal discovery procedures. This has been true because of the generally objective and easily verifiable nature of the documents prepared by the DISD's Department of Research, Evaluation, and Information Systems, created in 1970 to gather and compile student enrollment and achievement data. The Coalition has never before questioned this procedure.

. Therefore, absent a timely objection by the Coalition, we hold that the district court's consideration of these documents was proper.

### III.

The United States Supreme Court held in *Milliken v. Bradley (Milliken II)*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977), that it is within the power of a federal district court to order implementation of a remedial educational program as part of a desegregation decree. The Court acknowledged that constitutional violations were not necessarily remedied by traditional pu-

pil assignments alone, and that in some circumstances it might be necessary to go beyond *Swann* remedies to ensure the elimination of racial discrimination.

The law in this Circuit regarding remedial programs weighed heavily in the *Milliken II* decision. Beginning with *United States v. Jefferson County Board of Education*, 380 F.2d 385 (5th Cir.1967), *cert. denied*, 389 U.S. 840, 88 S.Ct. 77, 19 L.Ed.2d 104 (1967), this Circuit sitting *en banc* held that school boards and officials had an affirmative duty to overcome past inadequacies in minority education resulting from discrimination. *Id.* at 394. Two years after *Jefferson*, a panel of this Court held that in view of this affirmative duty, a district court could order establishment of remedial programs when necessary to give specific remedial help to disadvantaged minority children. *Plaquemines Parish School Board v. United States*, 415 F.2d 817, 831 (5th Cir.1969).

■ Thus, it is clear that the district court here was within the bounds of its discretionary authority in approving a remedial program going beyond pupil assignment. Unlike the remedial program in *Milliken II*, however, the remedial program here calls for the partial suspension of previous pupil assignments for some minority students who will return to neighborhood centers. This modification to the 1976 decree raises the question whether a court may, under its authority to monitor the desegregation of a dual-race school system, establish one-race remedial centers. We confine our review, as is proper, to the history and particular circumstances of the desegregation efforts in the DISD.

■ The primary goal of the Motion to Establish South Dallas Educational Centers is to close the achievement gaps in reading that exist between minority and anglo children in the DISD in grades 4 to 6. Current achievement levels for the students affected by the motion show 59% reading below the 30th national percentile for grades 4 to 6, and 82% below the 50th percentile. Performance among students in the local areas

affected by the motion is low when compared to achievement levels districtwide in grades 4 to 6.

The plan removes students from the existing feeder patterns approved under the 1976 desegregation decree and returns them to one of three remedial centers in grades 4 to 6. Approximately 2,300 minority students currently being bused out of nine attendance zones in South Dallas would be placed in one of the remedial centers located in South Dallas.[7]

The April 20 Motion outlines several aspects of the remedial program to be put into effect in the remedial centers. The central feature of the remedial centers will be a reduction in the teacher/pupil ratio to 1:20, as opposed to a ratio of 1:27 found throughout the DISD.[8] Other features include additional personnel in the administration of each center, special instructional strategies implemented in the centers, and an incentive pay plan for teachers linked to the accomplishment of the desired student achievement goals. The project will also provide after-school learning support centers, not available in other 4 to 6 centers, where students may receive assistance with homework and individual projects.

The district court under a meticulously careful review concluded that the establishment of the three South Dallas Centers would not adversely affect desegregation in the DISD. The court called the plan "a laudable commitment by the DISD to improve the achievement levels of the students at the centers in a district that has become heavily minority". *Tasby*, 585 F.Supp. at 457. The court's acceptance of the plan, however, was made subject to several conditions not specifically stated in the Motion. The court ordered that any

funds used to establish the South Dallas Centers were to be in addition to the programmatic remedy funds already provided and allocated by previous court orders. The court also directed that the physical facilities at the Centers "must compare favorably with the facilities which the students are leaving". *Id.* All improvements at the Centers were to be made before the facilities admitted students, and a report from the External Auditor was required to be made to the court before the facility was opened. The court further noted that "In the event the achievement level objectives are not being met, the court may, after hearing, require the district to provide such additional remedial education measures at the South Dallas Educational Centers as may appear to be necessary to enable the district to fulfill its commitment." *Id.*

Although the focus of the April 20 motion is the creation of three South Dallas Centers, the Coalition also expressed concern as to what impact the revisions in feeder patterns will have upon other 4 to 6 centers in the DISD. In 1983, there were twenty-seven 4 to 6 centers receiving students in the DISD under the feeder patterns. The April 20 Motion closed two of these centers, added two centers, and excluded ten of the 4 to 6 centers from the transportation program entirely. Seventeen 4 to 6 centers receiving students under the feeder patterns remain intact.

The court found that with respect to the ten 4 to 6 centers recommended for exclusion, only one, Reilly, would become predominantly anglo. The court felt this one center was justified due to significant time and distance problems involved with incorporating that center into the DISD's trans-

---

**7.** Students from Brown, City Park, Dunbar, Rhoads, Wheatley, and Harris would be brought back to the Anderson school. The school currently serves as a career exploration academy, but the academy would be moved to Longfellow. Approximately 1,360 4 to 6 grade students would attend Anderson. Students from Colonial and Thompson would attend the Thompson school and students from the Rice attendance zone would be brought back to Rice.

**8.** In their response to defendant's motion to Establish South Dallas Educational Centers, plaintiffs indicated that a ratio of 15:1 would probably be necessary to achieve the goals set forth by the DISD. In its reply to plaintiffs' response, DISD indicated that when attendance was taken into account, ratios of as low as 15 or 10:1 would probably exist on a day-to-day basis.

portation plans.[9] The district court found that that racial imbalance in some of the 4 to 6 centers would be improved as a result of changes made in the 4 to 6 centers throughout the DISD, and pupil reassignment would be eliminated in several naturally desegregated areas for grades 4 to 6. The district court concluded that the establishment of the three remedial centers would not have any adverse impact on the remainder of the district.

## IV.

█ We are not without concern for the fact that approximately 2,300 minority students will be returned to neighborhood schools to attend remedial centers that will be virtually 100 percent black. Nonetheless, we bear in mind that "there is obviously no one plan that would do the job in every case". *Green v. County School Board of New Kent County*, 391 U.S. 430, 439, 88 S.Ct. 1689, 1695, 20 L.Ed.2d 716 (1968). What may be an acceptable remedy in one school district may not meet constitutional standards if applied in another district. As the Supreme Court stressed *Milliken v. Bradley, (Milliken I)*, 418 U.S. 717, 738, 94 S.Ct. 3112, 3124, 41 L.Ed.2d 1069 (1974), the specific remedy proposed must directly address the constitutional violation, and be specifically tailored to cure the condition that offends the Constitution.

█ In an area as sensitive as school desegregation, the district courts are allowed considerable flexibility in fashioning appropriate equitable remedies. *See Swann*, 402 U.S. at 30–31, 91 S.Ct. at 1283. In reviewing desegregation orders, therefore, great deference is given to the district courts. Recognizing that the district courts are best situated to understand the particular problems and needs of the districts in which they sit, the Supreme Court stated in *Brown v. Board of Education, (Brown II)*, 349 U.S. 294, 299, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955); that "[b]ecause of their proximity to local conditions ... the [federal district] courts which originally

heard these cases can best perform this judicial appraisal".

We hold that the district court did not abuse its discretion in granting the Motion to Establish South Dallas Educational Centers. In keeping with *Milliken I*, the district court approved a remedial program that is specifically tailored to correct the unfortunate vestiges of discrimination in the DISD. Significant gaps in reading achievement exist in the DISD as a result of prior educational isolation. The purpose and scope of the new centers is narrow, and tailored to correct these deficiencies. Additionally, the plan sets forth quantifiable achievement goals that can easily be monitored by the court.

Although it cannot be denied that many black children will return to neighborhood centers that will be virtually 100% black, the significance of this fact is somewhat lessened when we consider that many of the students affected by the Motion were being bused to schools that had become predominantly minority because of the decline of anglo students in the school system. As a result, even though three one-race schools will exist under the plan, only one school in the DISD will become predominantly anglo once the feeder plans have been altered. As the district court noted, many of the schools where pupil assignments will be suspended will remain naturally desegregated.

The district court placed considerable weight on the support of the original plaintiffs in the suit in concluding that the South Dallas remedial program was an acceptable modification to the 1976 decree. The plaintiffs have been continually represented by the same counsel since the filing of the suit in 1970, and, in the opinion of the district court, "have consistently fought for the constitutional principle of maximum feasible desegregation". *Tasby*, 585 F.Supp. at 454. These parties have worked closely with the district court in monitoring the progress of this long and complex suit, and the court as part of its

---

9. Reilly is located in the northeastern corner of the DISD.

exercise of discretion was properly re-assured by their support for the motion.

■ In fashioning a remedy that is designed to cure the ills of past discrimination, district courts are authorized to implement plans that promise "realistically to work *now.*" *Green v. County School Board of New Kent County,* 391 U.S. at 439, 88 S.Ct. at 1694. The Motion to Establish South Dallas Centers proposes a program designed to achieve immediate effects to remedy serious performance deficiencies identified among a group of minority students in the DISD. But as the district court noted, "remedial education can never be the complete solution to previous segregation. The *sine que non* is the combination of remedial education and other desegregation measures, including feasible transportation, in the desegregation plan for the district as a whole". *Tasby,* 585 F.Supp. at 456 n. 10.

Our affirmance of the district court's order is not a wholesale endorsement of remedial measures suspending existing student assignment plans. This Court will continue to discharge its constitutional obligation to scrutinize the particular circumstances of individual school districts and examine closely the purpose of any such measures. In reviewing desegregation orders, we do not lose sight of the ultimate goal to be accomplished through implementation of remedial measures. That goal is nothing less than the complete disestablishment of dual school systems and the elimination of their lingering effects in order to guarantee equal educational opportunities for all children.

AFFIRMED.