DENNIS, Circuit Judge,
dissenting:
In the motion before us, the movant state officials, the Louisiana Board of Elementary and Secondary Education (“BESE”), the Louisiana Department of Education, and John White, State Superintendent of Education (collectively, “the State Officials”), have requested and are clearly entitled to have this court reverse the district court’s judgment and direct that court to abstain from further proceedings pending a potentially dispositive decision by the Louisiana Supreme Court in accordance with Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The majority recognizes that the criteria for Pullman abstention have been satisfied but nevertheless refuses to refrain from continuing this federal litigation, to reverse the district court’s judgment, and to order federal-court abstention in this case. I emphatically disagree. A state trial court has declared the *400 school-voucher law unconstitutional under the Louisiana State Constitution, that decision has been appealed directly to the Louisiana Supreme Court, and the state’s highest court will resolve that state constitutional issue soon. Accordingly, because the parties, and even the majority, agree that a Louisiana Supreme Court affir-mance of the state trial court’s judgment will moot this federal litigation entirely, I respectfully dissent from the majority’s refusal to reverse the district court’s judgment and order it to abide by Pullman abstention. There is no good reason for the continuation of this (potentially unnecessary) federal litigation at this time. We are qualified and able to make a decision regarding Pullman, we unanimously agree that the criteria for that abstention have been satisfied, and the rationale underlying that doctrine — reducing friction between the federal and state judiciaries when important questions of state law are involved — calls strongly for the doctrine’s invocation here.
Aside from the majority’s unfortunate decision to continue this federal litigation even though it concedes that Pullman abstention should be ordered, I also disagree strongly with the majority’s erroneous reasoning in granting a stay of the district court’s judgment pending appeal. First, the majority incorrectly'assumes that the doctrines of Pullman abstention and Eleventh Amendment sovereign immunity from federal suit may be invoked — not to terminate or halt this litigation — to enhance the State Officials’ likelihood of success on the merits in the stay-pending-appeal analysis. This assumption is plainly wrong. Those independent doctrines may be used to end or suspend a federal suit but not to enhance its likelihood of success on the merits on appeal for stay purposes. Second, the majority not only abuses process by refusing to invoke Pullman immediately but also incorrectly decides that the State Officials will be able to invoke Eleventh Amendment immunity from federal suit before the merits panel in this appeal. As the State Officials concede in their motion, however, the State of Louisiana is not a party of record or otherwise involved in the underlying litigation. Rather, in this case, the district court, enforcing its forty-five-year-old consent decree and desegregation order against the Tangipahoa Parish School Board, prospectively enjoined the State Officials from executing and applying a state law so as to violate the federal constitution by frustrating, interfering with, and threatening to dismantle the desegregation order, based on the Fourteenth Amendment and Brown v. Board of Education, that requires and establishes terms and conditions for the conversion of the parish public-school system from a racially discriminatory dual system to a constitutionally unitary system. It is well settled that prospective injunctive relief against state officers, as opposed to the state per se, which bars them from violations of the federal constitution or laws, does not contravene state sovereign immunity from federal court suits. See, e.g., Milliken v. Bradley, 433 U.S. 267, 289-90, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977); Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Third, the majority errs in its conclusion that the district court misused the All Writs Act to issue the preliminary • injunction against the State Officials. Finally, a correct application of the factors to be considered for a stay pending appeal under Nken v. Holder, 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009), shows clearly that the State Officials are not entitled to a stay of the district court’s judgment pending appeal, even if the majority erroneously refuses to. order federal-court abstention under Pullman.
*401 BACKGROUND
In 1967, the Court of Appeals for the Fifth Circuit, then engaged in overseeing the desegregation of numerous school districts in the South, laid down the following requirement in an en banc decision: “[t]he defendants shall provide remedial education programs which permit students attending or who have previously attended segregated schools to overcome past inadequacies in their education.” - United States v. Jefferson Cnty. Bd. of Educ., 380 F.2d 385, 394 (5th Cir.1967) (en banc). That same year, the District Court for the Eastern District of Louisiana, in Moore v. Tangipahoa Parish School Board, adopted a school-desegregation consent. decree finding that system to be an unconstitutional racially dual system and required the school board to convert it to a unitary non-racially discriminatory system. See 290 F.Supp. 96, 96 (E.D.La.1968) (citing Brown and Jefferson County). On March 4, 2010, following a series of earlier modifications, the district court, pursuant to the consent decree and after hearings and discussions with interested parties, issued an order (Rec.Doc. No. 876) establishing a desegregation order, under which the Tan-gipahoa Parish School Board, when it reached full compliance, would achieve uni-, tary school-system status and obviate the need for further judicial supervision. To. this end, the consent decree and order detailed numerous obligations with which the school board must comply, including: the construction of new schools and the enhancement of existing facilities; the creation of new magnet programs; new teacher assignments, certifications, and training; reporting and monitoring requirements to ensure compliance with the court’s order, and the design and implementation of a parish-wide school taxing district for the issuance of debt to finance capital improvements. Furthermore, the district court’s order detailed a student-assignment plan predicated on the ordered expenditures detailed above and expressly assumed receipt of MFP funding to satisfy the obligations imposed. See Doc. 876.
Subsequently, the Louisiana Legislature enacted Acts 1 and 2 of the 2012 Regular Session establishing a school-voucher program authorizing the disbursement of public funds, diverted from Minimum Foundation Program (“MFP”) funding, to enable eligible schoolchildren to leave Tangipahoa Parish public schools to attend private,' or non-public, schools of their choice. See La.Rev.Stat. § 17:4016. The MFP is a fund of public money dedicated to public primary and . secondary school education and determined by collaboration between the legislature and the BESE. It is then distributed according to a formula also derived' from that collaboration to each of the sixty-nine public school systems in .the state. Importantly, the provisions of the Louisiana State Constitution do not authorize the legislature to unilaterally alter the dedication or the distribution formula. See La. Const, art. VIII, § 13(B); La. Fed’n of Teachers v. Louisiana, No.612,733, Slip Op. at 22-34 (19th Dist. Nov. 30, 2012).
MFP funding, in conjunction with the operation of Act 2, is a zero-sum exercise such that MFP money, intended for public-school use, diverted for use by non-public schools deprives public-school districts such as Tangipahoa of the use of such funds. Currently, during the first year of the voucher program, fifty children in Tan-gipahoa Parish receive school-voucher funds and attend non-public schools. However, this number will surely grow as non-public schools, expand and new nonpublic schools are opened. In particular, the district court observed that thirty-two' of Tangipahoa’s public schools — representing a “considerable” number of students in the district — currently receive “C,” “D,” or “F” grades, entitling students at those *402 schools to receive a voucher enabling them to attend school elsewhere. Reimbursement for such vouchers comes from MFP funding the public schools would otherwise receive and, furthermore, corresponds with private-school tuition, which a private school is free to increase should it so desire. Doc. 1066, at 13 n. 2. Thus, the district court determined that Act 2 threatens to undermine the Tangipahoa Parish desegregation consent decree and the unitary school system plan of conversion by interfering with the court-mandated obligations laid out in the 2010 consent decree.
On September 24, 2012, the desegregation plaintiffs and the Tangipahoa Parish School Board filed a “Motion for Issuance of Writs Pursuant to the All Writs Act” (Doc. 1021, Exhibit “D”) to enjoin the State Officials’ implementation of section 17:4016 of the Louisiana Revised Statutes, which provides for a local-share allocation in the calculation of funding to city and parish school systems for students in Tan-gipahoa Parish attending non-public schools under the school-voucher program. The Tangipahoa Parish School Board claims that the school voucher program’s diversion of enrollment and public funding to non-public schools impedes the Board’s “ability to implement” the requirements of the consent decree (Doc. 876) in the areas of student assignment and facilities.
On October 22, 2012, the district court issued an “Order and Reasons” (Doc. 1066, Exhibit “E”) compelling the State Officials to appear before the court on October 30, 2012 and “show cause, if any they can, as to why a preliminary injunction should not be entered herein restraining, enjoining and prohibiting the State Officials’ further implementation of La. R.S. § 17:4016 that otherwise would off-set the Tangipahoa Parish School District’s local contribution against Minimum Foundation Program Funding to be allocated” to Tangipahoa and why a mandatory preliminary injunction should not enter ordering the State Officials to immediately commence funding to Tangipahoa if the voucher-funds recipient-students return to public schools.
Following argument at a hearing on November 26, 2012, the district court orally denied the State Officials’ motions, granted a preliminary injunction, and instructed the parties to submit proposed orders consistent with the court’s oral reasons. On November 28, 2012, the district court entered the Order proposed by the desegregation parties (Doc. 1063, Exhibit “B”) thus broadly enjoining the School Officials from implementing the school-voucher program in Tangipahoa Parish.
The following day, November 29, 2012, the district court issued an Order (Doc. 1065, Exhibit “C”) denying the State Officials’ request for a stay pending appeal in part because “state law, not imposed by the preliminary injunction, provides an available option for reallocating agency resources. See La. R.S. 24:653(F).” On November 30, 2012, the district court issued an “Order and Written Reasons” (Doc. 1066, Exhibit “E”) denying the State Officials’ “Motion To Set Aside the Granting of the Two All Writs Motions” (Plaintiffs’ Doc. 1031; Defendants’ Doc. 1021).
The State Officials, in accordance with Rule 8 of the Federal Rules of Appellate Procedure, moved this court to stay a portion of the preliminary injunction rendered November 28, 2012. Considering the time-sensitive issues raised herein, we granted a temporary stay pending further order of this court to allow us time to consider the parties’ motions and arguments and to act upon them effectively and expeditiously.
DISCUSSION
A. Pullman Abstention Should Be Ordered
As this court has noted, “Pullman abstention ] ... is addressed to ... the *403 undesirability of reaching constitutional questions that might be mooted by the application of state law.” Word of Faith World Outreach Ctr. Church, Inc. v. Morals, 986 F.2d 962, 967 (5th Cir.1993). For instance, “[w]here there is an action pending in state court that will likely resolve the state-law questions underlying the federal claim, [the Supreme Court has] regularly ordered abstention.” Harris Cnty. Comm’rs Court v. Moore, 420 U.S. 77, 83, 95 S.Ct. 870, 43 L.Ed.2d 32 (1975) (collecting cases). Further, “when the state-law questions have concerned matters peculiarly within the province of the local courts, [the Court has] inclined toward abstention.” Id. at 83-84, 95 S.Ct. 870 (citations omitted). In this regard,
[a]mong the cases that call most insistently for abstention are those in which the federal constitutional challenge turns on a state statute, the meaning of which is unclear under state law. If the state courts would be likely to construe the statute in a fashion that would avoid the need for a federal constitutional ruling ..., the argument for abstention is strong.
Id. at 84, 95 S.Ct. 870. Thus, when there is a “substantial uncertainty as to the meaning of state law” and “a reasonable possibility that the state court’s clarification of state law might obviate the need for a federal constitutional ruling,” the district court must abstain from adjudicating the federal constitutional claim. Erwin Chemerinsky, Federal Jurisdiction § 12.2, at 818 (6th ed.2012). This proposition is mirrored in our precedent, under which, if a decision on the state law issue would make adjudication of the federal constitutional challenge unnecessary, the district court must abstain. See Nationwide Mut. Ins. Co. v. Unauthorized Practice of Law Comm., 283 F.3d 650, 653 (5th Cir.2002). As described in more detail below, Pullman abstention is clearly and immediately warranted in this case. Indeed, the majority agrees that Pullman abstention is called for but treats it as an optional, malleable doctrine that it may delay and merge with its determination of whether the appeal is likely to succeed under the Nken four-factor test. This is grievous, compounded error. Because of the nature of the Pullman doctrine, it applies only to decide when federal courts should abstain or refrain from further adjudication of a claim because its resolution may be mooted by a state-court decision and not, as the majority misuses it, to predict whether a defense on the merits will be successful on appeal under Nken. Pullman abstention is designed to stop potentially unnecessary federal litigation in its tracks and therefore should have nothing to do with perpetuating federal litigation on appeal.
1.
In the case before us, the criteria warranting Pullman abstention plainly have been met. First, a state trial court in Baton Rouge has declared Act 2 invalid under the Louisiana State Constitution as an unauthorized reassignment of students and diversion of MFP funds away from public schools and into non-public schools,[1] and that decision is now pending on direct appeal to the Louisiana Supreme Court.[2] The State Officials, as well as the majority, agree that if the state supreme court affirms the trial court’s decision, this federal litigation will be moot, because in the
*404 absence of the 2012 state law there will be no diversion .of public funds for private tuition or reassignment of students to nonpublic schools. Given that the parties challenging Act 2’s constitutionality prevailed in the state trial court, there is sufficient uncertainty as to the meaning of state law (namely, whether Act 2 comports with the commands of the Louisiana State Constitution). Especially noteworthy in this regard is that the state court ruled' Act 2 unconstitutional on the basis of a unique provision of the Louisiana State Constitution — one without analog in the U.S. Constitution — providing that funds dedicated jointly by the legislature and the BESE under the MFP formula for Louisiana’s public-schools systems must be directed to public parish and city school boards that administer those systems and may not be diverted unilaterally by the legislature to non-public schools. See La. Fed’n of Teachers v. Louisiana, No. 612,-733, Slip Op. at 22-34 (19th Dist. Nov. 30, 2012); see also La. Const, art. VIII, § 13(B)-(C). As stated in a noted treatise, “abstention is justified if there is a unique state constitutional provision and a state court interpretation of it could make a federal constitutional decision unnecessary.” Chemerinsky, supra, § 12.2, at 822; see also Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970) (abstention appropriate due to unclear meaning of unique fishing-rights provision of state constitution).
Second, adjudication of the pending state-court challenge to the constitutionality of Act 2 could render moot the need to address the petitioners’ federal constitutional challenge involving Act 2, which is predicated on the district court’s desegregation order under Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and United States v. Jefferson County, 380 F.2d 385 (1967) (en banc), and the parties so agreed at the November 26, 2012 hearing.[3] This is because if the state court rules Act 2 unconstitutional on the basis of the Louisiana State Constitution, the petitioners’ claimed threatened harm — the State Officials’ de-funding of the Tangipahoa Parish school system, their authorizing reassignment of parish- students to non-public schools, and their payment of such schools’ tuition with MFP money pursuant to Act 2, and the resulting impediment to the school, district’s ability, for lack of funds, to comply with the district court’s desegregation order — will vanish, thus obviating the need to rule on the petitioners’ federal constitutional challenge. For these reasons, I believe that Pullman abstention should be applied here; accordingly, the district court’s judgment should be immediately reversed and the case remanded with instruction for the district court to abstain under Pullman. See Harris Cnty., 420 U.S. at 89 n. 14, 95 S.Ct. 870 (“Ordinarily the proper course in ordering ‘Pullman abstention’ is to remand with instructions to retain jurisdiction but to stay the federal suit pending determination of the state-law questions in state court.”).[4]
2.
Although the majority concedes that the criteria for Pullman abstention have been *405 met, it wrongly refuses to apply it immediately and continues this litigation by misusing the doctrine to assist in granting the State Officials a stay of the district court’s judgment pending appeal. This is double error because Pullman abstention should be ordered immediately when it appears that federal litigation may be an unnecessary entanglement and interference with state law; and the Pullman abstention criteria do not relate to the merits of the district court’s injúnetion. Rather, Pullman is an independent doctrine, predicated on federalism, the avoidance of unnecessary federal constitutional rulings through abstention, .and the value of allowing state courts to resolve sensitive and unique state issues first, before proceeding with federal litigation. On this basis, Pullman requires analysis independent from that conducted under Nlcen to decide whether to stay, the district court judgment while the federal litigation continues on appeal.
Second, despite acknowledging that Pullman should apply, the majority erroneously concludes that the appeal may continue and that the State Officials’ motion for a stay pending appeal should be granted. See Op. at 399. The Supreme Court has instructed that when Pullman abstention is called for, the proper course is to remand with instruction to retain jurisdiction but stay the federal suit pending determination of the state-law question in state court. See Harris Cnty., 420 U.S. at 89 n. 14, 95 S.Ct. 870; Morales, 986 F.2d at 968-70 (reversing and remanding for further proceedings consistent with the court’s instruction to abstain under Pullman). Once it is determined that the Pullman doctrine is applicable, we lack any discretion to proceed otherwise.
Third, in connection with Pullman ab7 stention we should certify the question regarding Act 2’s constitutionality under the Louisiana State Constitution to the Louisiana Supreme Court. Certification is appropriate because, even though the issue has already been appealed to the state high court our certification of it may expedite resolution of this potentially disposi-tive question and will serve the goals of abstention and avoidance by obviating the need to rule on the petitioners’ federal constitutional challenge. As the Court wrote in Aázonans for Official English v. Arizona, “Pullman abstention [has] proved protracted and expensive in practice, for it entail[s] a full round of litigation in the state court system before any. resumption of proceedings in federal court.” 520 U.S. 43, 76, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997); see also Chemerinsky, supra, § 12.3, at 840 (noting that the procedure, followed under Pullman and requiring parties to litigate state-law claims in state court first) “commonly takes many years and imposed substantially increased costs on litigants”). “Certification procedure, in contrast, allows a federal court faced with a novel state-law question to put the question- directly to the State’s highest court, reducing the delay, cutting the cost, and increasing the assurance of .gaming an authoritative response.” Arizonans, 520 U.S. at 76, 117 S.Ct. 1055; see also Lehman Bros. v. Schein, 416 U.S. 386, 391, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974) (noting that certification saves “time, energy, and resources and helps build a cooperative judicial federalism”); Chemerin-sky, supra, § 12.3, at 841 (“Certification greatly simplifies the abstention procedure and therefore reduces the delays and increased costs usually accompanying abstention.”). Certification will expedite resolution of this case while serving important goals of our nation’s federalism. And in-particular, time is of the essence when educating children.
*406 B. The State Officials Are Not Entitled to Sovereign Immunity from Suit in Federal Court To Enjoin Them from Thwarting and Interfering with a Valid Desegregation Order
Contrary to the majority’s decision, the Eleventh Amendment does not bar the district court’s enforcement of the federal consent decree and desegregation order by enjoining the State Officials from frustrating, interfering with, or threatening to dismantle those federal orders by executing a state law that sharply conflicts with the federal decrees by authorizing, inter alia, reassignment of public school students to non-public schools and the increasing diversion of state MFP funds away from the parish’s public-school system to pay for transfer students’ non-public school tuition.
As the Supreme Court held in Frew v. Hawkins, a case such as this “involves the intersection of two areas of federal law: the reach of the Eleventh Amendment and the rules governing consent decrees.” 540 U.S. 431, 437, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004). As the Supreme Court explained:
The Eleventh Amendment confirms the sovereign status of the States by shielding them from suits by individuals absent their consent. To ensure the enforcement of federal law, however, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. This standard allows courts to order prospective relief as well as measures ancillary to appropriate prospective relief. Federal courts may not award retrospective relief, for instance, money damages or its equivalent, if the State invokes its immunity.
Id. (citations omitted). This case is not a suit for money damages or its equivalent against the State, but rather a suit for an injunction requiring the State Officials to conform their conduct to federal constitutional law as interpreted by Brown and its progeny and as set forth in the desegregation consent decree entered in this case in 1965 and updated by succeeding desegregation orders, the most recent being the 2012 desegregation order.
“Consent decrees have elements of both contracts and judicial decrees.” Id. Thus, “[a] consent decree ‘embodies an agreement of the parties’ and is also ‘an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees.’ ” Id. And “[cjonsent decrees entered in federal court must be directed to protecting federal interests.” Id. In Firefighters v. Cleveland, the Court “observed that a federal consent decree must spring from, and serve to resolve, a dispute within the court’s subject-matter jurisdiction; must come within the general scope of the case made by the pleadings; and must further the objectives of the law upon which the complaint was based.” Id. (citing 478 U.S. 501, 525, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986)).
Here, the State Officials do not contend that the terms of the consent decree or desegregation order were impermissible under Brown and Jefferson County. Nor do they contend that the consent decree failed to comply with Firefighters. Rather, the officials challenge only the district court’s means of enforcement of the decree and order, not their validity or entry.
The state officials rely heavily on the Supreme Court’s decision in Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), and the Eleventh Circuit’s decision in DeKalb County School District v. Schrenko, 109 F.3d 680 (11th Cir.1997). Pennhurst and DeKalb County, which re *407 lies primarily on Pennhurst, however, are distinguishable. In those cases, the courts found the rationale of Ex parte Young inapplicable to suits brought against state officials alleging violations of state-law. 465 U.S. at 106, 104 S.Ct. 900, 109 F.3d at 688. Jurisdiction was thus improper because “[a] federal court’s grant of relief against state officials on the basis of state-law, whether prospective or retroactive, does not vindicate the supreme authority of federal law.” Pennhurst, 465 U.S. at 106, 104 S.Ct. 900. Here, by contrast, the law to be enforced is not state law but federal law, embodied in a federal consent decree and desegregation order that was entered to implement the Fourteenth Amendment of the U.S. Constitution as interpreted by Brown and its progeny. This is the federal law which the State Officials have been enjoined from frustrating or threatening to dismantle.
Therefore, this case is governed by the Supreme Court’s decision in Ex parte Young and its progeny in which the Court has striven to harmonize the principles of state sovereign immunity with the effective supremacy of rights and powers secured elsewhere in the Constitution. When a suit is brought only against state officials, as in the present case, a question arises as to whether that suit is a suit against the State itself. Pennhurst, 465 U.S. at 101, 104 S.Ct. 900. “Although prior decisions of [the Supreme] Court have not been entirely consistent on this issue, certain principles are well established.” Id. For instance, the Eleventh Amendment bars a suit against state officials when “the state is the real, substantial party in interest.” Ford Motor Co. v. Dep’t of Treasury, 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945). “The general rule is that a suit is against the sovereign if ‘the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,’ or if the effect of the judgment would be ‘to restrain the Government from acting, or to compel it to act.’ ” Dugan v. Rank, 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963) (citations omitted). However,
[t]he Court has recognized an important exception to this general rule: a suit challenging the constitutionality of a state official’s action is not one against the State. This was the holding in Ex parte Young, ... in which a federal court enjoined the Attorney General of the State of Minnesota from bringing suit to enforce a state statute that allegedly violated the Fourteenth Amendment. This Court held that the Eleventh Amendment did not prohibit issuance of this injunction. The theory of the case was that an unconstitutional enactment is “void” and therefore does not “impart to [the officer] any immunity from responsibility to the supreme authority of the United States.” Since the State could not authorize the action, the officer was “stripped of his official or representative character and [was] subjected to the consequences of his official conduct.
Pennhurst, 465 U.S. at 102, 104 S.Ct. 900 (citation omitted). Further,
[w]hile the rule permitting suits alleging conduct contrary to “the supreme authority of the United States” has survived, the theory of Young has not been provided an expansive interpretation. Thus, in Edelman v. Jordan, ... the Court emphasized that the Eleventh Amendment bars some forms of injunc-tive relief against state officials for violation of federal law. In particular, Edel-man held that when a plaintiff sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official’s future conduct, but not one that awards retroactive monetary relief. Under the *408 theory of Young, such a suit would not be one against the State since the federal-law allegation would strip the state officer of his official authority.
Id. at 102-03, 104 S.Ct. 900. Thus, prospective injunctive relief against a state officer does not amount to retroactive relief that would be barred by the Eleventh Amendment. See id.
Applying the foregoing principles, it is clear that the district court’s injunction of the State Officials’ future unconstitutional conduct that would contravene federal law by frustrating and threatening defeat of the federal, consent decree and desegregation order, based on federal constitutional law, is not a suit or an injunction against the state. Nor does the district court’s injunction violate the Eleventh Amendment by granting retroactive relief against the state or any state official or by ordering the payment of any compensation for past wrongs by the state or its officers.
The majority does not disagree with the principles enunciated by the Supreme Court in Ex parte Young and its progeny as set forth above. Instead, the majority totally mischaracterizes the district court’s injunction by incorrectly stating that it is “an award of monetary relief against the State’s treasury,” Op. at 394; that it requires the State “to answer what is essentially a claim for contribution from one of its subdivisions in federal court,” Op. at 395; and that “this matter does not involve a party seeking a state official’s compliance with federal law that will indirectly cost the state more money,” Op. at 394.
A fair and accurate reading of the record demonstrates that the district court’s injunction merely requires the State Officials to conform their prospective conduct to federal law as stated in the desegregation consent decree and orders; and that it does not order the state to contribute anything from its treasury or, for that matter, to do anything at all. Indeed, because the state has not been made a party, the injunction applies only against the State Officials and orders that their “implementation of [Act 2] of the 2012 Regular Session of the Louisiana Legislature be enjoined in accordance with this Court’s previous order,” in which the district court stated that its injunction would apply to restrain them prospectively from frustrating the court’s implementation of the desegregation consent decree and orders.
The majority’s implicit argument that Superintendent White may not be enjoined under Ex parte Young because there is no claim that he has violated federal law or acted outside of his official capacity is without merit. The Louisiana State Constitution places general duties on him and the members of the BESE to administer Act 2 of the Regular Session of the 2012 Legislature. See La. Const, art. 8, §§ 2, 13. Act 2 itself more specifically places a duty on them to take actions that would violate federal law by frustrating the district court’s implementation of its desegregation consent decree and orders. Under Ex parte Young, in making an officer of the state a defendant in a suit to enjoin the unconstitutional enforcement of a state law, the officer must have some connection with the enforcement of the act. “The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact, and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists.” Ex parte Young, 209 U.S. at 157, 28 S.Ct. 441; see also K.P. v. LeBlanc, 627 F.3d 115, 124 (5th Cir.2010) (citing this passage from Young).
Finally, the cases the majority cites in support of its assertion that this is a suit against the state in violation of the Eleventh Amendment are inapposite because *409 they are cases in which a suit essentially sought retroactive relief, or monetary compensation, against the state itself, and not prospective injunctive relief against a state official. As the Supreme Court has stated:
[The Young ] doctrine has existed alongside our sovereign-immunity jurisprudence for more than a century, accepted as necessary to “permit the federal courts to vindicate federal rights.” It rests on the premise — less delicately called a “fiction[ ]” — that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes.
Va. Office for Protection & Advocacy v. Stewart, — U.S. -, 131 S.Ct. 1632, 1638, 179 L.Ed.2d 675 (2011). In the present case, that is all the district court has done, viz., command the State Officials to refrain from violating federal law embodied in the desegregation consent decree and orders. Accordingly, the district court had jurisdiction to issue the injunction, and the Eleventh Amendment presented no bar.
C. The State Officials Have Failed To Make a Strong Showing of a Likelihood of Success on the Merits Regarding the District Court’s Application of the All Writs Act
The All Writs Act, 28 U.S.C. § 1651(a), empowers “a federal court to issue such commands ... as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction, otherwise obtained.” United States v. N.Y. Tel. Co., 434 U.S. 159, 172, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977). Under the Act, a district court may issue a writ binding persons or entities that were not parties to ■the underlying litigation if their conduct ■frustrates the court’s order. See id. at 174, 98 S.Ct. 364. As the Supreme Court has stated, “three conditions must be satisfied-before [the writ] may issue”:
First, “the party seeking issuance of the writ [must] have no other adequate means to attain the relief he desires,” a condition designed to ensure that the writ will not be used as a substitute for the regular appeals process. Second, the petitioner must satisfy “the burden of showing that [his] right to issuance of the writ is clear and indisputable.” Third, even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances.
Cheney v. U.S. Dist. Court for D.C., 542 U.S. 367, 380-81, 124 S.Ct. 2576, 159 L.Ed.2d 459 (2004) (internal quotation marks and citations omitted). Although .the majority asserts that the district court lacked authority under the Act, this is incorrect.
Given the framework advanced by the majority, the State Officials bear the burden of demonstrating a strong showing of a likelihood of success on the merits that one or more of the conditions outlined in Cheney is missing. See Op. at 391-93, 396-98; see also Nken, 556 U.S. at 434, 129 S.Ct. 1749. The State Officials have not met this burden. Instead, their only argument regarding the All Writs Act is that the Act “cannot serve as an independent basis for jurisdiction.” See Texas v. Real Parties in Interest, 259 F.3d 387, 392 (5th Cir.2001).[5] However, no one disputes *410 that the district court already possessed an independent basis for the exercise of jurisdiction: namely, the decades-old desegregation suit out of which the 2010 consent decree arose and is still under the district court’s supervision. Thus, the State Officials’ argument misses the mark and, moreover, does not constitute a strong showing of a likelihood of success on the merits as required by Nken.
Given the State Officials’ terse All Writs Act analysis, the majority has seen fit to supply the State Officials’ argument for them. Not only is this inappropriate under Nken, but the majority’s arguments are also incorrect. First, the majority asserts that the petitioners possess adequate means of relief apart from the All Writs Act. Op. at 396-97. The meager options the majority suggests are twofold: (1) entreat the State Legislature to either provide greater funding or repeal Act 2; or (2) rely on the pending state-court proceeding addressing the constitutionality of Act 2 under the Louisiana State Constitution. See id. However, and as the district court observed in its November 30 order, the pending state-court proceeding does not address compliance with the 2010 consent decree nor how Act 2 will affect Tan-gipahoa’s ability to achieve unitary status; that issue would be beyond the scope of that proceeding. Although resolution of the pending state-court suit may moot the need for further federal litigation, this factor is addressed to Pullman abstention, see supra, not the first factor for invocation of the All Writs Act, which asks whether recourse to the state-court litigation will enable the petitioners to assert their claim that the State Officials’ administration of Act 2 frustrates and defeats the school board’s compliance with the 2010 consent decree. Moreover, given that the state trial court declined to enjoin the voucher program, timely access to relief is not available to petitioners. See Stephanie Simon, Louisiana Voucher Program Ruled Unconstitutional, The Huff-ington Post, Nov. 30, 2012, http://www. huffingtonpost.com/2012/ll/30/judge-rules-louisiana-sch_n_222096 2.html. Regarding whether the petitioners should be required to lobby the legislature, relief from that body not only is speculative but also ignores that, absent the injunctive relief requested, the petitioners’ ability to comply with the consent decree will be undermined and severely frustrated.
Second, the majority contends that the petitioners have not shown that their right to the writ is “clear and indisputable” because they allegedly rely on speculation and general financial information to show the harm that Act 2 creates. See Op. at 396-97. The district court noted that the applicability of the All Writs Act in this very context (namely, allowing a federal court to enforce its consent decrees) is well established. Moreover, the majority’s argument impermissibly shifts the burden from the State Officials requesting a stay to the petitioners who have successfully convinced the district court that application of the All Writs Act is warranted. The district court is in a better position, having supervised the underlying desegregation suit for decades and overseen countless hours of careful negotiations between the parties, to judge what will and will not affect Tangipahoa’s compliance with the consent decree. See Tasby v. Black Coal, to Maximize Educ., 771 F.2d 849, 855 (5th Cir.1985) (reasoning that “great deference is given to the district courts” in reviewing desegregation orders because “the district courts are best situated to understand the particular problems and needs of the districts in which they sit” and “their proximity to local conditions” enables them to “best perform this judicial appraisal”) (internal quotation marks omitted) (citing Brown v. Bd. of Educ., 349 U.S. 294, 299, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) {Brown II)); cf. Spal- *411 lone v. United States, 493 U.S. 265, 281, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990) (Brennan, J., dissenting) (referring to the district court’s “intimate contact” with and “special insight” into the facts of the case and criticizing the Court for its “ex post rationalization” from its “detached vantage point” for disturbing the district court’s calculated judgment of what would “most likely ... work quickly and least disruptively” in the case); see also Newby v. Enron Corp., 338 F.3d 467, 476 (5th Cir.2003) (reviewing issuance of a writ pursuant to the All Writs Act for abuse of discretion). The majority’s analysis, then, robs the district court of the deference we are required to pay to the court’s determination that Act 2 is a threat to compliance with the federal constitutionally required consent decree and unitary system conversion plan. See Tasby, 771 F.2d at 855.
Third, the majority reasons that issuance of the writ was not appropriate under the circumstances because only one-quarter of one percent of schoolchildren in the parish are affected, at this point in time in the first year of the voucher program. Again, this pays little fealty to the considered wisdom and common sense of the district court’s judgment and, moreover, ignores the determination that the number of schoolchildren participating in the voucher program, thereby abandoning the public schools in Tangipahoa and depriving them of much-needed funding, undoubtedly will increase in future. For the foregoing reasons, I do not believe the State Officials have satisfied their burden of making a strong showing of a likelihood of success on the merits regarding the district court’s utilization of the All Writs Act.
D. The State Officials Have Failed To Satisfy Their Burden of Demonstrating All Four Nken Factors To Justify a Stay Pending Appeal
The State Officials bear the burden of satisfying all four Nken factors in order to warrant a stay pending appeal. See 556 U.S. at 434, 129 S.Ct. 1749. Despite this, the State Officials have satisfied none.
First, the State Officials have failed to make a strong showing of a likelihood of success on the merits. Even assuming that analysis under the Eleventh Amendment and Pullman doctrine is appropriately subsumed under Nken’s first factor — a contention with which I take great issue given the jurisdiction-sapping nature of affirmative answers under either doctrine— the State Officials’ arguments based on the Eleventh Amendment, Pullman, and the All Writs Act fail to demonstrate a strong showing of a likelihood of success on the merits. Thus, the State Officials must make a strong showing in some other fashion.
In this regard, the State Officials bear the burden of strongly showing that the district court abused its discretion in granting a preliminary injunction to halt Act 2’s interference with the consent decree in Tangipahoa. See Planned Parenthood Ass’n of Hidalgo Cnty. Tex., Inc. v. Suehs, 692 F.3d 343, 348 (5th Cir.2012). This is a high bar, one that calls for greater deference to the findings and conclusions of the district court than if we as a panel were to conduct a de novo review of the issues presented in this appeal. See id.; Tasby, 771 F.2d at 849, 855. The district court determined, based in part on the testimony, discussions, and evidence it considered in formulating its consent decree and unitary-school-system plan, that the operation of Act 2 in Tangipahoa would undermine or unduly impede the school board’s ability to comply with the consent decree and the goal of achieving unitary status. Thus, the State Officials are obliged to make a strong showing that the diversion of MFP funding away from the *412 public-school system and into non-public schools via the use of vouchers by schoolchildren opting out of the former to attend the latter, would not interfere with or undermine the district court’s carefully crafted consent decree and unitary school system plan, which was based on projections measuring public-school enrollment and the corresponding allocation of MFP funds to Tangipahoa by the State. I particularly note that the State Officials introduced no evidence to show that Act 2’s unilateral diversion of MFP funds and enrollment from public schools to non-public schools would not interfere with and undermine the district court’s consent decree and unitary public school system plan for Tangi-pahoa- public schools. They did not show — nor, I question, could they — that the diversion of MFP funding from Tangi-pahoa would not affect the meticulous requirements imposed on the school system, including the construction of new facilities, the improvement of old ones, new teacher-training requirements, school programs, and student assignments. Instead, the State Officials simply argued that Tangipa-hoa received slightly more MFP funds for the 2012-2013 school year than it received for the 2011-2012 school year. This argument did not take into account the added burdens imposed upon the Tangipahoa public system by the district court’s consent decree and unitary plan in the next and succeeding years. Because of a lack of evidence and failure to acknowledge that growth in profits without accounting for added debt does not guarantee financial health, the State Officials have failed to satisfy their burden of making a strong showing of likelihood of success in reversing the district court’s findings and judgment with respect to Nken’s first factor.
Second, the State Officials have failed to make out an irreparable injury as required by Nken’s second factor. Our temporary stay of the injunction on December 14, 2012 permitted the payment of the fifty children’s vouchers on December 17, 2012 and the continued implementation of Act 2 in Tangipahoa. This undercuts the majority’s contention that the fifty participating schoolchildren would have to relocate absent timely payments during the school year. See Op. at 398. Further, even under the injunction’s terms, the loss of vouchers by the fifty schoolchildren currently enrolled in the voucher program in Tangipahoa neither substantially nor irreparably would have injured the voucher program or the affected children. The schoolchildren would have remained entitled to free public education by the Tangi-pahoa school district and Act 2 would have been temporarily stopped only as to fifty students in one public-school district out of sixty-nine statewide. Therefore, even if we had not issued our temporary stay of the injunction, no irreparable injury would have befallen the state or the fifty children due to the district court’s judgment.
Regarding the third and fourth Nken factors — whether the stay will substantially harm the petitioners and a determination of where the public interest lies — the State Officials have also failed to satisfy Nken’s commands. In particular, the State Officials rely solely on their assertion that the school board in fact received more funding this year than it did last year. But, as mentioned previously, the State Officials’ argument fails to take into account the burdens the school system will be obligated to discharge in the future; essentially, the State Officials are reading only one side of Tangipahoa’s profit-and-loss statement. Showing that neither the public interest in public education nor the Tangipahoa public school system, within the context of the consent decree and Unitary plan, will be harmed by the Act 2 voucher program requires a much more complex analysis. The additional burdens *413 on the Tangipahoa public school system by the consent decree and unitary school system plan, as well as - other factors such as demographics and inflation, would have to be taken into account.
The majority’s attempt to minimize the ' harm that will befall petitioners if they are unable to comply with consent decree, as well as their assertion that Nken’s last two factors are “less significant” ignores that State Officials’ burden in satisfying all four factors. See Nken, 556 U.S. at 434, 129 S.Ct. 1749; Op. at 398-99. Additionally, the district court observed that the expansion of non-public schools in and around the parish concomitant with the enactment of Act 2, as well as the likely increase in the number of students availing themselves of vouchers, would further destabilize the carefully crafted consent decree. Doc. No. 1066, at 12-13. Under the third Nken factor, it is up to the State Officials to demonstrate that the petitioners will not be substantially harmed. See id. It is not the role of the majority, • conceding that Act 2 interferes with the school board’s ability to comply with the consent decree, see Op. at 399, to assert' that Act 2 does not interfere with Tangipa-hoa’s compliance enough. All this leads to the conclusion that the State Officials have failed to carry their burden with respect to Nken’s third and fourth factors. Based on this and foregoing, the State Officials have failed to carry their burden and thus demonstrate that a stay is warranted based on an application of the Nken factors.
CONCLUSION
For the foregoing reasons, I respectfully dissent from the majority’s refusal to' grant the State Officials’ request to order Pullman abstention in this case by reversing the district court’s judgment and remanding the case to it for federal-court abstention; from the majority’s improper use of the doctrines of sovereign immunity and Pullman abstention in its Nken analysis; from its determination that sovereign immunity bars the district ■ court’s injunction. issued to restrain the- State Officials from doing nothing more than violating federal law embodied, in the district court’s desegregation consent decree and orders; and from its erroneous determination that the State Officials satisfied their burden with respect to all four factors under Nken.

. See Lauren McGaughy, Jindal Voucher Overhaul Unconstitutionally Diverts Public Funds to Private Schools, Judge Rules, The Times-Picayune, Nov. 30, 2012, http://www.nola.com/ politics/index.ssf/2012/l 1/ jindaLvoucher_ overhaul_uncons.html.

. See La. Const, art. 5, § 5(D)(1).

. That the desegregation order was entered in a desegregation case premised on Brown and its progeny demonstrates the constitutional dimensions of the ruling requested by the petitioners. See Freeman v. Pitts, 503 U.S. 467, 491, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992) (describing "those provisions of the law and the Constitution " as "predicate for judicial intervention” by way of a consent decree) (emphasis added).

. The exception to the rule, not at issue here, is where the state "has. ruled[ ] ... that it cannot grant declaratory relief under state law if a federal court retains jurisdiction over the federal claim.” Id.

. The State Officials also assert that the Act may not be "used to circumvent or supersede the constitutional limitations of the Eleventh Amendment.” See In re Baldwin-United Corp., 770 F.2d 328, 340 (2d Cir.1985). Given that the Eleventh Amendment does not bar the present suit, this observation is beside the point.