IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 14, 2013

Lyle W. Cayce
Clerk

————————————

No. 12-31218

————————————

M. C. MOORE, as father and next friend to minors Joyce Marie Moore, Jerry
Moore, and Thelma Louise Moore; HENRY SMITH, as father and next friend
to minors Bennie Smith, Charles Edward Smith, Shirley Ann Smith, and
Earline Smith,

Plaintiffs - Appellees

v.

TANGIPAHOA PARISH SCHOOL BOARD, a corporation,

Defendant - Appellee

v.

LOUISIANA BOARD OF ELEMENTARY AND SECONDARY EDUCATION;
LOUISIANA DEPARTMENT OF EDUCATION; JOHN WHITE,

Movants - Appellants

————————————

Appeals from the United States District Court
for the Eastern District of Louisiana
U.S.D.C. No. 2:65-CV-15556

————————————

Before JONES, DENNIS, and HAYNES, Circuit Judges.

PER CURIAM:[*]

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 12-31218

In a longstanding pending desegregation case, the district court enjoined certain non-party state actors (Appellants here) from implementing a recently passed statute with respect to the defendant parish school board.  The Appellants filed an emergency motion seeking to stay a portion of a preliminary injunction pending appeal.  On December 14, 2012, we granted a temporary stay pending further order of this court.  We note that this matter comes before us as a motions panel only on the question of whether a stay pending appeal should be granted.  The motion was filed as an emergency motion, with limited time for briefing and consideration.  Under the posture of the case as presented to us, we are addressing only the question of whether the district court's injunction order should be stayed pending consideration of all arguments raised by the parties – jurisdictional and otherwise – following full briefing and, if appropriate, oral argument.  In assessing whether to grant a stay, we necessarily must examine the merits of the parties' arguments.  But, given the procedural posture of this case, we emphasize that we do not intend to bind the ultimate merits panel which will consider the matter following full appellate process.  Additionally, we determine that a full exposition of the law in this area is unnecessary and inappropriate at this stage, so we will endeavor to be brief in our reasoning.  For the reasons stated below, we now GRANT the Appellants' motion and STAY the district court's order pending appeal.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The desegregation plaintiffs and the Tangipahoa Parish School Board ("the Board") (collectively, "the Petitioners") filed motions for the issuance of writs pursuant to the All Writs Act, 28 U.S.C. § 1651(a), seeking injunctions against the further implementation of certain provisions of Acts 1 and 2 of the 2012 Regular Session of the Louisiana Legislature ("Act 1" and "Act 2") based on their alleged interference with a court-ordered consent decree.  The underlying consent decree arose from a 1965 federal desegregation suit, *Moore v.*

No. 12-31218

*Tangipahoa Parish School Board*, in which the district court issued an order establishing certain student assignment and facilities requirements aimed at assisting the Board in achieving unitary school system status.

The most relevant portion of the newly enacted law is the Student Scholarships for Educational Excellence Act, LA. REV. STAT. ANN. §§ 17:4011–:4025, implemented through Act 2. This Act creates a school-voucher or scholarship program ("the Program") that allows students in Tangipahoa Parish ("the Parish") to attend alternative public or private educational institutions in lieu of attending their assigned underperforming public school in the Parish. *See* LA. REV. STAT. ANN. §§ 17:4013, :4018. When students elect to participate in the Program, Minimum Foundation Program ("MFP") funds, which are state funds intended for public education, are diverted from the student's assigned public school in the Parish to the alternative public or private institution where the student is educated. *See id.* § 17:4016. At present, fifty of the approximately 20,000 students in the Parish are participating in the Program. The Petitioners allege that compliance with the court-ordered consent decree requires them to receive full MFP funding and that the Program's diversion of MFP funds frustrates their ability to implement the provisions of the decree.

On October 22, 2012, the district court ordered John White, Louisiana Superintendent of Education ("Superintendent White"), the Louisiana Department of Education ("the Department"), and the Louisiana Board of Elementary and Secondary Education ("BESE") (collectively, "the State"), "to show cause . . . as to why a preliminary injunction should not be entered . . . enjoining and prohibiting . . . further implementation of [the Program in the Parish]." The district court also ordered the State to show "why a mandatory preliminary injunction should not be entered . . . directing [the State] to

3

No. 12-31218

immediately commence full MFP funding to the [Board] for each student on a scholarship pursuant to the [Program]."

The State responded and during the November 26, 2012, hearing the district court issued a preliminary injunction.[1]  As instructed by the court, the Petitioners and the State submitted proposed orders consistent with the court's oral reasons.  On November 28, 2012, the district court entered the Petitioners' proposed order thereby enjoining the Program in the Parish.

The next day, the court denied the State's request for a stay of the preliminary injunction pending appeal.  The State timely moved this court to stay a portion of the preliminary injunction.  *See* FED. R. APP. P. 8(a)(1)(C).

At the same time that the federal district court injunction process was ongoing, a lawsuit challenging the constitutionality of the Program was pending in a Louisiana state trial court.  That case examines the validity of the Program under the Louisiana state constitution.  *See La. Fed'n of Teachers v. Louisiana*, No. 612,733, slip op. at 2 (19th La. Dist. Nov. 30, 2012).  The state trial court found that the Program violates the state constitution by diverting public funds from the state's public schools to private entities.  *See id.*  This ruling may be directly appealed to the Louisiana Supreme Court and, as discussed below, could render this federal action moot.

## II. STANDARD OF REVIEW

We review a district court's denial of a stay pending appeal for abuse of discretion.  *See Wildmon v. Berwick Universal Pictures*, 983 F.2d 21, 23 (5th Cir. 1992); *see also Beverly v. United States*, 468 F.2d 732, 740 n.13 (5th Cir. 1972)

---

[1] The district court enjoined the Student Scholarships for Educational Excellence Act, LA. REV. STAT. ANN. §§ 17:4011–:4025, the Course Choice Program, LA. REV. STAT. ANN. §§ 17:4002.1–:4002.6, and certain provisions of Act 1, which focus on teacher tenure and accountability.  Because the State requests a stay of the injunction only as it pertains to the Program administered pursuant to the Student Scholarships for Educational Excellence Act, we do not consider whether the injunction should be stayed as to these other provisions.

("[T]he accepted standard for review of such a stay is whether or not the trial court abused its sound discretion in denying the stay."). The factors for evaluating the appropriateness of a stay pending appeal are well-established: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also Nken v. Holder*, 556 U.S. 418, 426 (2009).

"The first two factors of the traditional standard are the most critical." *Nken*, 556 U.S. at 434. As the movant for a stay pending appeal, the State carries the burden to satisfy the four factors, *see Ruiz v. Estelle*, 666 F.2d 854, 856 (5th Cir. 1982), and it is not entitled to the stay as a matter of right. *See Nken*, 556 U.S. at 433.

## III. DISCUSSION

We conclude that the State has met its burden of establishing that the district court abused its discretion in denying the stay of the preliminary injunction.[2]

### A. Likelihood of Success on the Merits

The State must make "a strong showing that [it] is likely to succeed on the merits." *Hilton*, 481 U.S. at 776. In assessing this standard, "the movant need not always show a 'probability' of success on the merits." *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981) (citation omitted). "[I]nstead, the [State] need only present a substantial case on the merits when a serious legal question is

---

[2] As discussed above, this appeal presents an emergency motion to stay, which is being decided on an abbreviated briefing schedule and within a limited time. We apply only the standard governing whether a stay of the preliminary injunction should be granted. Accordingly, nothing in our opinion should be read as an intent to bind the merits panel determining whether the district court appropriately issued the injunction.

involved and show that the balance of the equities weighs heavily in favor of granting the stay." *Id.*; *see also Nken*, 556 U.S. at 434 (noting that the movant must show "[m]ore than a mere possibility of relief"). The State has demonstrated that it is likely to succeed in establishing that the district court improperly issued the preliminary injunction based on several grounds including: (1) the district court's lack of jurisdiction under the Eleventh Amendment; (2) the *Pullman* abstention doctrine; and (3) the lack of evidence establishing authority for the court to act pursuant to the All Writs Act.

    1.  <u>Lack of Jurisdiction Based on Eleventh Amendment Immunity</u>

The State has a strong likelihood of prevailing on its claim that the district court did not have jurisdiction to issue the preliminary injunction because its exercise of authority violated the State's Eleventh Amendment sovereign immunity. Absent a waiver of immunity by a state or through a federal statute, the Eleventh Amendment protects states from suit in federal court regardless of whether the suit seeks damages or injunctive relief. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-01 (1984); *see also Quern v. Jordan*, 440 U.S. 332, 337 (1979) (noting that this immunity guards a state from "a suit in federal court by private parties seeking to impose a liability which must be paid from public funds."). "This bar remains in effect when State officials are sued for damages in their official capacity" because "a judgment against a public servant in his official capacity imposes liability on the entity that he represents." *Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (internal quotation marks and citations omitted); *see also Edelman v. Jordan*, 415 U.S. 651, 663 (1974) ("It is also well established that even though a State is not named a party to the action, the suit may nonetheless be barred by the Eleventh Amendment.").

The principle of state sovereign immunity also prohibits subdivisions of a state from seeking relief against state defendants in federal court. *Harris v. Angelina Cnty., Tex.*, 31 F.3d 331, 339 (5th Cir. 1994). Indeed, "we can think of

No. 12-31218

few greater intrusions on state sovereignty than requiring a state to respond, in federal court, to a claim for contribution brought by one of its own [subdivisions]." *Id.* at 340 (citation omitted); *see also Stanley v. Darlington Cnty. Sch. Dist.*, 84 F.3d 707, 716 (4th Cir. 1996) ("It would be an unfathomable intrusion into a state's affairs—and a violation of the most basic notions of federalism—for a federal court to determine the allocation of a state's financial resources. The legislative debate over such allocation is uniquely an exercise of state sovereignty."). In general, then, federal courts do not interfere in a state's disputes with its own political subdivisions.

Here, Petitioners seek injunctive relief against two state agencies, the Department and BESE. Further, there is no claim that Superintendent White has violated federal law or acted outside of his official capacity, and the State is not a party to the consent decree. Accordingly, there is a significant likelihood that the State can show the preliminary injunction offends Eleventh Amendment immunity because an injunction against the Department, BESE, or Superintendent White is effectively an injunction against the State.

The Petitioners' statements in their briefing to the district court reveal the true nature of their complaint. Specifically, the Board seeks to avoid "a reduction in MFP funding" because "[t]he school board is in need of funding now" and it "can ill afford to have the state reduce its share of MFP funding." These statements show that the Board does not seek an injunction to prevent violations of federal law, but instead seeks such relief in order to prevent the implementation of the state legislature's decisions concerning education funding, a quintessentially state issue. They also show that the essence of the relief sought is not injunctive but rather monetary – enjoining the State from "failing to pay" is little less than telling the State *to* pay.

In addition to requiring the State to address legislative decisions about state funding in federal court, the district court thus required the State to

respond to what is essentially a contribution claim by one of its own subdivisions. Such disputes concerning the allocation of the state's financial resources fall within the purview of a state's sovereign power, and requiring a state to answer a claim for contribution – however disguised – from one of its own subdivisions violates its Eleventh Amendment immunity. *See Harris*, 31 F.3d at 340; *see also Kelley v. Metro. Cnty. Bd. of Educ. of Nashville & Davidson Cnty., Tenn.*, 836 F.2d 986, 998 (6th Cir. 1987) (federal courts should not "adjudicate an internal dispute [concerning funding for a desegregation order] between a local governmental entity and the very state that created it."). Indeed, a school district cannot recover funds expended in compliance with a desegregation order when the state is not a party to the desegregation order. *See United States v. Tex. Educ. Agency*, 790 F.2d 1262, 1264-65 (5th Cir. 1986). Such attempts to recover funding from a state ostensibly to comply with a desegregation order to which it is not a party "smacks of an attempted end-run around the [state] legislature's allocation of state funds." *Id.* at 1265.

The district court justified the issuance of the preliminary injunction—which essentially serves as an award of monetary relief against the State's treasury—by noting that the Supreme Court "has curbed [the limitation proscribing an award of money damages] in the case of a federal court giving prospective injunctive relief against a state officer even though compliance with the injunction will cost the state money in the future." A district court is not free to interfere in state spending decisions simply because raising and lowering funding levels may have some incidental impact on a federal decree. The injunction here is not aimed at preventing direct interference with a court-ordered consent decree, but instead bars state officials from implementing a state's program and funding decisions because of their attenuated connection to a consent decree. Unlike the cases relied on by the district court, this matter does not involve a party seeking a state official's compliance with federal law

that will indirectly cost the state more money. *See, e.g.*, *Quern*, 440 U.S. at 336, 349 (federal court has jurisdiction to order state officials to send notification to class plaintiffs of the availability of an administrative remedy to recover public benefits); *Edelman*, 415 U.S. at 668 (finding a federal court cannot require the "payment of state funds, not as a necessary consequence of compliance in the future with a substantive federal-question determination"). Furthermore the district court's reliance on *Milliken v. Bradley* is misplaced because, unlike here, the state in *Milliken* was a party to the original desegregation order and was found to be partially responsible for the segregation. 433 U.S. 267, 269, 289-90 (1977) (finding that federal court has jurisdiction to allocate costs between state and local officials when ordering a school desegregation plan).

Put another way, the gravamen of Petitioners' claims is an attempt to avoid decreases in education funding. Masking it as a concern about compliance with the district court's desegregation order does not change the fundamental nature of the injunction as one directly affecting a state's sovereign decision-making about state spending. This approach, then, conflicts with the State's sovereign immunity by requiring it to answer what is essentially a claim for contribution from one of its subdivisions in federal court. Accordingly, the State has a strong likelihood of success in showing that the district court's issuance of the preliminary injunction violated the State's Eleventh Amendment sovereign immunity.[3]

2. Pullman <u>Abstention</u>

---

[3] The extent of the Board's argument concerning this issue on appeal lies in its assertion that the injunction does not run afoul of the Eleventh Amendment to the extent that it enjoins "John White in his official capacity." The Board does not cite any authority for this conclusion. The fact that Superintendent White is enjoined in his official capacity does not cure the potential affront to Eleventh Amendment immunity in this matter. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985); *see also Kelley*, 836 F.2d at 989 ("The applicability of the bar of sovereign immunity simply is not affected by the circumstance that the nominal defendant is an individual state official . . . ." (citation omitted)).

No. 12-31218

"[T]he Supreme Court [has] 'instructed federal courts that the principles of equity, comity, and federalism in certain circumstances counsel abstention in deference to ongoing state proceedings.'" *See Wightman v. Tex. Supreme Court*, 84 F.3d 188, 189 (5th Cir. 1996) (quoting *Fieger v. Thomas*, 74 F.3d 740, 743 (6th Cir. 1996)).  Based on the application of this principle in *Railroad Commission v. Pullman Co.*, 312 U.S. 496 (1941), the State is likely to prevail in its claim that the district court should not have exercised jurisdiction in light of the pending state-court action challenging the validity of the Program under Louisiana's constitution.[4]

A federal court should generally abstain from exercising jurisdiction in a matter when an unsettled area of state law has an effect on the outcome of a federal constitutional claim or would render a decision on the federal issue unnecessary.  *Pullman*, 312 U.S. at 496; *see, e.g.*, *Askew v. Hargrave*, 401 U.S. 476, 478 (1971) (explaining that when the outcome of a case in state court could remove the need to decide a federal issue a federal court should stay the proceeding until the state court has rendered judgment).  Although "abstention [i]s applicable only in narrowly limited special circumstances," the doctrine should be applied when "[a] state court decision . . . could conceivably avoid any decision [of the federal question] and would avoid any possible irritant in the federal-state relationship." *Reetz v. Bozanich*, 397 U.S. 82, 86-87 (1970) (internal quotation marks and citation omitted); *Word of Faith World Outreach Ctr. Church, Inc. v. Morales*, 986 F.2d 962, 967 (5th Cir. 1993) (citation omitted) ("*Pullman* abstention . . . is addressed to the inappropriateness of federal court

---

[4] Because we conclude that *Pullman* abstention is appropriate, we need not address the abstention doctrine applied in *Younger v. Harris*, 401 U.S. 37 (1971).  *Younger* abstention applies when: "(1) the dispute . . . involve[s] an ongoing state judicial proceeding, (2) an important state interest in the subject matter of the proceeding [is] implicated, and (3) the state proceedings . . . afford an adequate opportunity to raise constitutional challenges." *Tex. Ass'n of Bus. v. Earle*, 388 F.3d 515, 519 (5th Cir. 2004) (internal quotation marks and citation omitted).

resolution of difficult or unsettled questions of state law and the undesirability of reaching constitutional questions that might be mooted by the application of state law."). This doctrine "[i]s based on 'the avoidance of needless friction' between federal pronouncements and state policies." *Reetz*, 397 U.S. at 87 (quoting *Pullman*, 312 U.S. at 500).

This matter presents the very conflict that *Pullman* abstention seeks to avoid—i.e., "'needless friction' between [a] federal pronouncement[] and state policies"—as it involves a federal court enjoining a state's legislatively-determined funding decisions prior to allowing the state to consider whether such decisions comport with its own constitution. *See id.* The State thus has shown a strong likelihood of succeeding on the merits of its claim that *Pullman* abstention applies because the resolution of an unsettled area of state law—whether the Program's transfer of public-education funds to non-public schools offends Louisiana's state constitution—could obviate the need to consider the federal issue of whether the Program renders the Petitioners unable to comply with the court-ordered consent decree. *See Nationwide Mut. Ins. Co. v. Unauthorized Practice of Law Comm.*, 283 F.3d 650, 653 (5th Cir. 2002). Such a result is certainly possible in light of a recent decision by a Louisiana district court holding that the Program violates the state constitution. *See La. Fed'n of Teachers*, No. 612,733, slip op. at 2.

In sum, the Petitioners' claims that the Program interferes with the consent decree are "'entangled in a skein of state law that must be untangled before the federal case can proceed[.]'" *See Harris Cnty. Comm'rs Court v. Moore*, 420 U.S. 77, 88 (1975) (quoting *McNeese v. Bd. of Educ.*, 373 U.S. 668, 674 (1963)). Accordingly, the State has a strong likelihood of establishing that the district court erred in exercising jurisdiction in light of the *Pullman* abstention doctrine.

No. 12-31218

3. Lack of Evidence Establishing Authority to Act Pursuant to the All Writs Act

Examining the proceedings in the district court prior to issuance of the injunction, we are further persuaded of the State's likelihood of success on the merits based on the district court's lack of authority to act pursuant to the All Writs Act, which serves as the district court's self-proclaimed basis for jurisdiction. The All Writs Act provides "power [to] a federal court to issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977); *see also* 28 U.S.C. § 1651(a). As the district court appropriately recognized, this power may be applied to individuals or entities that were not parties in the underlying litigation when their conduct frustrates the court's order. *See N.Y. Tel.*, 434 U.S. at 174 (citation omitted). "This authority, though, 'is firmly circumscribed, its scope depend[s] on the nature of the case before the court and the legitimacy of the ends sought to be achieved through the exercise of the power.'" *Netsphere, Inc. v. Baron*, No. 10-11202, 2012 WL 6583058, at *6 (5th Cir. Dec. 18, 2012) (quoting *ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1358-59 (5th Cir. 1978)).

Three elements must be satisfied for a district court to act pursuant to this statute, and the burden of establishing them in the district court is on the Petitioners. *See Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380 (2004). First, "the party seeking issuance of the writ [must] have no other adequate means to attain the relief he desires." *Id.* (alteration in original) (citation and internal quotation marks omitted). When alternative means of relief are available, the court should not issue a writ. *See, e.g.*, *Pa. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 43 (1985) (finding the use of the All Writs Act to compel transportation of prisoners was inappropriate because "[a]lthough that

12

No. 12-31218

Act empowers federal courts to fashion extraordinary remedies when the need arises, it does not authorize them to issue ad hoc writs whenever compliance with statutory procedures appears inconvenient or less appropriate."). Here, the Petitioners have alternative means of relief apart from reliance on a writ. In addition to seeking relief from the state legislature in the form of additional funding or repeal of the Program, the Petitioners may avail themselves of relief in state court. In fact, proceedings in the state court already suggest that alternative relief would be available in light of a recent decision from a state district court holding that the Program's disbursement of education funds to private institutions violates Louisiana's state constitution. *See La. Fed'n of Teachers*, No. 612,733, slip op. at 2.

Second, the party seeking the writ must meet its "burden of showing that [its] right to issuance of the writ is clear and indisputable." *Cheney*, 542 U.S. at 381 (citation and internal quotation marks omitted). The State has a strong argument that the Petitioners have not established their "clear and indisputable" right to the writ. Generally, a writ is appropriate when it addresses a direct affront to a district court's order. *See, e.g.*, *United States v. Hall*, 472 F.2d 261, 262-64 (5th Cir. 1972) (finding an injunction under the All Writs Act proper in the desegregation context to prevent a member of a militant group from intentionally violating a court order denying his entry into a high school campus).

Petitioners contend that the Board faces a large, general budget shortfall and that any decrease in funding due to students electing to attend schools other than their assigned public school will adversely affect its "ability to implement" the requirements of the consent decree. In the district court, Petitioners had the burden to provide evidence to support their contentions. Instead, the Board presented general financial data and budgets that provide a general and superficial overview of the school's funding mechanism, as well as a few specific

13

No. 12-31218

budget needs that are unrelated to schools affected by the Program.[5] The Board further relies on affidavits from administrators at two of the private schools participating in the Program to suggest that these schools intend to expand, which in turn will adversely affect the Board's ability to implement the consent decree. This evidence—based merely on general financial information and speculation that the Program will eventually expand to a point that causes them harm—fails to demonstrate immediate irreparable harm warranting relief.[6] *See Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) ("Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." (citation omitted)). The "evidence" was nothing more than a generalized concern that an already cash-strapped school board would find itself with fewer resources. No specifics about the particular decreases and the particular impact was provided to the district court.

Third, assuming the petition meets the first two requirements, a court should exercise discretion before issuing a writ to ensure it "is appropriate under the circumstances." *Cheney*, 542 U.S. at 381 (citation omitted). The All Writs Act does not grant blanket authority to enjoin state conduct in matters related to a state's funding of its subdivisions. Instead, the authority under the All Writs Act "is to be used sparingly and only in the most critical and exigent

---

[5] For instance, in its Reply Memorandum and Listing of Supporting Documentation filed in the district court on November 19, 2012, the Board included an exhibit discussing the projected costs to improve the Kentwood High School facility. Kentwood High School, however, is not one of the "assigned schools" or "last attending school" for any of the fifty students participating in the Program.

[6] Indeed, the little evidence presented is to the contrary. Prior to filing its Motion for Issuance of Writs, the Board requested a modification of the consent decree to authorize approximately $1.4 million of improvements to five schools, none of which are the "assigned school" or "last attending school" of the fifty students enrolled in the Program. This modification of the consent decree is significant because it suggests that while the Board claims it cannot sustain the loss of MFP funding associated with the Program, the Board's budget still allows it to modify the consent to decree in order to receive authorization to allocate additional money to schools unaffected by the Program.

14

circumstances." *Wisc. Right to Life, Inc. v. Fed. Election Comm'n*, 542 U.S. 1305, 1306 (2004) (citation and internal quotation marks omitted).

The State has made a strong showing that it is likely to succeed on the merits of the argument that the district court's reliance on the All Writs Act was not appropriate based on the circumstances. Petitioners' arguments during the November 26 district court hearing suggest nothing more than that the Program frustrates the consent decree by interfering with their calculations based on projections in school growth and student attendance. It is difficult to imagine, however, that the Program, which affects less than one quarter of one percent of the Parish's students, will have a substantial enough effect on the Board's calculations to warrant the "extraordinary remedies" provided by the All Writs Act.

The Board's rationale leads to the conclusion that whenever a state legislature's actions result in an indirect reduction in education funding a federal court can enjoin the implementation of the funding decision so long as the party seeking the writ merely shows that it is in need of funding or that a change in funding could limit its financial resources. Such a broad use of authority is not compatible with the Supreme Court's admonition that the All Writs Act is an extraordinary form of relief.[7]

## B. Irreparable Harm

---

[7] The district court also purported to act pursuant to its inherent powers. The cases relied upon by the district court in the exercise of this power, however, involved the enforcement of consent decrees against parties who agreed to be bound by the decrees. *See e.g.*, *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 435-36 (2004) (enforcing consent decree against state officials who were parties to the original decree); *United States v. City of Miami, Fla.*, 664 F.2d 435, 436 (5th Cir. 1981) (limiting the effect of a consent decree on a party who did not agree to the decree). Accordingly, even if the Board presented adequate evidence that the Program conflicted with the consent decree, the All Writs Act—and not the court's inherent power—would serve as the proper source of authority to protect a consent decree from the actions of a non-party to the decree.

No. 12-31218

The irreparable injury to the State caused by the preliminary injunction weighs in favor of a stay pending appeal. *See Hilton*, 481 U.S. at 776. As the State points out, the immediate implementation of the injunction will cause irreparable harm to the fifty students participating in the Program because the failure to make timely scholarship payments to the students' schools would result in the children having to relocate during the school year. This result would frustrate the State's program thereby causing harm to it and the students that the State seeks to serve. The injunction causes further direct irreparable harm against the State as it deprives the State of the opportunity to implement its own legislature's decisions concerning education funding and forces it to answer for claims in federal court that are likely barred by Eleventh Amendment immunity.

## C. Substantial Injury to Petitioners and Public Interest

The factors discussed above—a substantial likelihood of success on the merits and the irreparable harm to the State—are the most important. *Nken*, 556 U.S. at 434. The final two factors—the potential for substantial injury to the Petitioners and the public interest—are less significant in our analysis. We recognize that the Board may face an injury if it is unable to comply with the consent decree, which could affect its ability to become a unitary school system. The evidence presented in the district court, however, belies the claim of injury to the Petitioners, at least at this point.

Finally, the public interest factor leans in favor of the State. Enjoining a State from implementing its own law while an appeal is pending before a federal court invokes significant concerns related to principles of federalism and comity. These concerns are especially significant here where the State is enjoined from implementing its education funding due to an appeal of a federal court action involving claims for which the State is likely entitled to Eleventh Amendment immunity.

No. 12-31218

## IV. CONCLUSION

For the reasons discussed above, we GRANT the Appellants' motion to STAY a portion of the preliminary injunction pending appeal.

DENNIS, Circuit Judge, dissenting:

In the motion before us, the movant state officials, the Louisiana Board of Elementary and Secondary Education ("BESE"), the Louisiana Department of Education, and John White, State Superintendent of Education (collectively, "the State Officials"), have requested and are clearly entitled to have this court reverse the district court's judgment and direct that court to abstain from further proceedings pending a potentially dispositive decision by the Louisiana Supreme Court in accordance with *Railroad Commission v. Pullman Co.*, 312 U.S. 496 (1941). The majority recognizes that the criteria for *Pullman* abstention have been satisfied but nevertheless refuses to refrain from continuing this federal litigation, to reverse the district court's judgment, and to order federal-court abstention in this case. I emphatically disagree. A state trial court has declared the school-voucher law unconstitutional under the Louisiana State Constitution, that decision has been appealed directly to the Louisiana Supreme Court, and the state's highest court will resolve that state constitutional issue soon. Accordingly, because the parties, and even the majority, agree that a Louisiana Supreme Court affirmance of the state trial court's judgment will moot this federal litigation entirely, I respectfully dissent from the majority's refusal to reverse the district court's judgment and order it to abide by *Pullman* abstention. There is no good reason for the continuation of this (potentially unnecessary) federal litigation at this time. We are qualified and able to make a decision regarding *Pullman*, we unanimously agree that the criteria for that abstention have been satisfied, and the rationale underlying that doctrine—reducing friction between the federal and state judiciaries when important questions of state law are involved—calls strongly for the doctrine's invocation here.

Aside from the majority's unfortunate decision to continue this federal litigation even though it concedes that *Pullman* abstention should be ordered,

No. 12-31218

I also disagree strongly with the majority's erroneous reasoning in granting a stay of the district court's judgment pending appeal. First, the majority incorrectly assumes that the doctrines of *Pullman* abstention and Eleventh Amendment sovereign immunity from federal suit may be invoked—not to terminate or halt this litigation—to enhance the State Officials' likelihood of success on the merits in the stay-pending-appeal analysis. This assumption is plainly wrong. Those independent doctrines may be used to end or suspend a federal suit but not to enhance its likelihood of success on the merits on appeal for stay purposes. Second, the majority not only abuses process by refusing to invoke *Pullman* immediately but also incorrectly decides that the State Officials will be able to invoke Eleventh Amendment immunity from federal suit before the merits panel in this appeal. As the State Officials concede in their motion, however, the State of Louisiana is not a party of record or otherwise involved in the underlying litigation. Rather, in this case, the district court, enforcing its forty-five-year-old consent decree and desegregation order against the Tangipahoa Parish School Board, prospectively enjoined the State Officials from executing and applying a state law so as to violate the federal constitution by frustrating, interfering with, and threatening to dismantle the desegregation order, based on the Fourteenth Amendment and *Brown v. Board of Education*, that requires and establishes terms and conditions for the conversion of the parish public-school system from a racially discriminatory dual system to a constitutionally unitary system. It is well settled that prospective injunctive relief against state officers, as opposed to the state *per se*, which bars them from violations of the federal constitution or laws, does not contravene state sovereign immunity from federal court suits. *See, e.g., Milliken v. Bradley*, 433 U.S. 267, 289-90 (1977); *Ex parte Young*, 209 U.S. 123 (1908). Third, the majority errs in its conclusion that the district court misused the All Writs Act to issue the preliminary injunction against the State Officials. Finally, a correct application

19

of the factors to be considered for a stay pending appeal under *Nken v. Holder*, 556 U.S. 418, 434 (2009), shows clearly that the State Officials are not entitled to a stay of the district court's judgment pending appeal, even if the majority erroneously refuses to order federal-court abstention under *Pullman*.

## BACKGROUND

In 1967, the Court of Appeals for the Fifth Circuit, then engaged in overseeing the desegregation of numerous school districts in the South, laid down the following requirement in an *en banc* decision: "[t]he defendants shall provide remedial education programs which permit students attending or who have previously attended segregated schools to overcome past inadequacies in their education." *United States v. Jefferson Cnty. Bd. of Educ.*, 380 F.2d 385, 394 (5th Cir. 1967) (en banc). That same year, the District Court for the Eastern District of Louisiana, in *Moore v. Tangipahoa Parish School Board*, adopted a school-desegregation consent decree finding that system to be an unconstitutional racially dual system and required the school board to convert it to a unitary non-racially discriminatory system. *See* 290 F. Supp. 96, 96 (E.D. La. 1968) (citing *Brown* and *Jefferson County*). On March 4, 2010, following a series of earlier modifications, the district court, pursuant to the consent decree and after hearings and discussions with interested parties, issued an order (Rec. Doc. No. 876) establishing a desegregation order, under which the Tangipahoa Parish School Board, when it reached full compliance, would achieve unitary school-system status and obviate the need for further judicial supervision. To this end, the consent decree and order detailed numerous obligations with which the school board must comply, including: the construction of new schools and the enhancement of existing facilities; the creation of new magnet programs; new teacher assignments, certifications, and training; reporting and monitoring requirements to ensure compliance with the court's order, and the design and implementation of a parish-wide school taxing district for the issuance of debt

to finance capital improvements. Furthermore, the district court's order detailed a student-assignment plan predicated on the ordered expenditures detailed above and expressly assumed receipt of MFP funding to satisfy the obligations imposed. *See* Doc. 876.

Subsequently, the Louisiana Legislature enacted Acts 1 and 2 of the 2012 Regular Session establishing a school-voucher program authorizing the disbursement of public funds, diverted from Minimum Foundation Program ("MFP") funding, to enable eligible schoolchildren to leave Tangipahoa Parish public schools to attend private, or non-public, schools of their choice. *See* LA. REV. STAT. § 17:4016. The MFP is a fund of public money dedicated to public primary and secondary school education and determined by collaboration between the legislature and the BESE. It is then distributed according to a formula also derived from that collaboration to each of the sixty-nine public school systems in the state. Importantly, the provisions of the Louisiana State Constitution do not authorize the legislature to unilaterally alter the dedication or the distribution formula. *See* LA. CONST. art. VIII, § 13(B); *La. Fed'n of Teachers v. Louisiana*, No.612,733, Slip Op. at 22-34 (19th. Dist. Nov. 30, 2012).

MFP funding, in conjunction with the operation of Act 2, is a zero-sum exercise such that MFP money, intended for public-school use, diverted for use by non-public schools deprives public-school districts such as Tangipahoa of the use of such funds. Currently, during the first year of the voucher program, fifty children in Tangipahoa Parish receive school-voucher funds and attend non-public schools. However, this number will surely grow as non-public schools expand and new non-public schools are opened. In particular, the district court observed that thirty-two of Tangipahoa's public schools—representing a "considerable" number of students in the district—currently receive "C," "D," or "F" grades, entitling students at those schools to receive a voucher enabling them to attend school elsewhere. Reimbursement for such vouchers comes from

MFP funding the public schools would otherwise receive and, furthermore, corresponds with private-school tuition, which a private school is free to increase should it so desire. Doc. 1066, at 13 n.2. Thus, the district court determined that Act 2 threatens to undermine the Tangipahoa Parish desegregation consent decree and the unitary school system plan of conversion by interfering with the court-mandated obligations laid out in the 2010 consent decree.

On September 24, 2012, the desegregation plaintiffs and the Tangipahoa Parish School Board filed a "Motion for Issuance of Writs Pursuant to the All Writs Act" (Doc. 1021, Exhibit "D") to enjoin the State Officials' implementation of section 17:4016 of the Louisiana Revised Statutes, which provides for a local-share allocation in the calculation of funding to city and parish school systems for students in Tangipahoa Parish attending non-public schools under the school-voucher program. The Tangipahoa Parish School Board claims that the school voucher program's diversion of enrollment and public funding to non-public schools impedes the Board's "ability to implement" the requirements of the consent decree (Doc. 876) in the areas of student assignment and facilities.

On October 22, 2012, the district court issued an "Order and Reasons" (Doc. 1066, Exhibit "E") compelling the State Officials to appear before the court on October 30, 2012 and "show cause, if any they can, as to why a preliminary injunction should not be entered herein restraining, enjoining and prohibiting the State Officials' further implementation of LA. R.S. § 17:4016 that otherwise would off-set the Tangipahoa Parish School District's local contribution against Minimum Foundation Program Funding to be allocated" to Tangipahoa and why a mandatory preliminary injunction should not enter ordering the State Officials to immediately commence funding to Tangipahoa if the voucher-funds recipient-students return to public schools.

Following argument at a hearing on November 26, 2012, the district court orally denied the State Officials' motions, granted a preliminary injunction, and

No. 12-31218

instructed the parties to submit proposed orders consistent with the court's oral reasons.  On November 28, 2012, the district court entered the Order proposed by the desegregation parties (Doc. 1063, Exhibit "B") thus broadly enjoining the School Officials from implementing the  school-voucher program in Tangipahoa Parish.

The following day, November 29, 2012, the district court issued an Order (Doc. 1065, Exhibit "C") denying the State Officials' request for a stay pending appeal in part because "state law, not imposed by the preliminary injunction, provides an available option for reallocating agency resources. *See* LA. R.S. 24:653(F)."  On November 30, 2012, the district court issued an "Order and Written Reasons" (Doc. 1066, Exhibit "E") denying the State Officials' "Motion To Set Aside the Granting of the Two All Writs Motions" (Plaintiffs' Doc. 1031; Defendants' Doc. 1021).

The State Officials, in accordance with Rule 8 of the Federal Rules of Appellate Procedure, moved this court to stay a portion of the preliminary injunction rendered November 28, 2012.  Considering the time-sensitive issues raised herein, we granted a temporary stay pending further order of this court to allow us time to consider the parties' motions and arguments and to act upon them effectively and expeditiously.

## DISCUSSION

### A. *Pullman* Abstention Should Be Ordered

As this court has noted, "*Pullman* abstention[] . . . is addressed to . . . the undesirability of reaching constitutional questions that might be mooted by the application of state law."  *Word of Faith World Outreach Ctr. Church, Inc. v. Morales*, 986 F.2d 962, 967 (5th Cir. 1993).  For instance, "[w]here there is an action pending in state court that will likely resolve the state-law questions underlying the federal claim, [the Supreme Court has] regularly ordered abstention."  *Harris Cnty. Comm'rs. Court v. Moore*, 420 U.S. 77, 83 (1975)

(collecting cases). Further, "when the state-law questions have concerned matters peculiarly within the province of the local courts, [the Court has] inclined toward abstention." *Id.* at 83-84 (citations omitted). In this regard,

> [a]mong the cases that call most insistently for abstention are those in which the federal constitutional challenge turns on a state statute, the meaning of which is unclear under state law. If the state courts would be likely to construe the statute in a fashion that would avoid the need for a federal constitutional ruling . . . , the argument for abstention is strong.

*Id.* at 84. Thus, when there is a "substantial uncertainty as to the meaning of state law" and "a reasonable possibility that the state court's clarification of state law might obviate the need for a federal constitutional ruling," the district court must abstain from adjudicating the federal constitutional claim. Erwin Chemerinsky, FEDERAL JURISDICTION § 12.2, at 818 (6th ed. 2012). This proposition is mirrored in our precedent, under which, if a decision on the state law issue would make adjudication of the federal constitutional challenge unnecessary, the district court must abstain. *See Nationwide Mut. Ins. Co. v. Unauthorized Practice of Law Comm.*, 283 F.3d 650, 653 (5th Cir. 2002). As described in more detail below, *Pullman* abstention is clearly and immediately warranted in this case. Indeed, the majority agrees that *Pullman* abstention is called for but treats it as an optional, malleable doctrine that it may delay and merge with its determination of whether the appeal is likely to succeed under the *Nken* four-factor test. This is grievous, compounded error. Because of the nature of the *Pullman* doctrine, it applies only to decide when federal courts should abstain or refrain from further adjudication of a claim because its resolution may be mooted by a state-court decision and not, as the majority misuses it, to predict whether a defense on the merits will be successful on appeal under *Nken*. *Pullman* abstention is designed to stop potentially

No. 12-31218

unnecessary federal litigation in its tracks and therefore should have nothing to do with perpetuating federal litigation on appeal.

1.

In the case before us, the criteria warranting *Pullman* abstention plainly have been met. First, a state trial court in Baton Rouge has declared Act 2 invalid under the Louisiana State Constitution as an unauthorized reassignment of students and diversion of MFP funds away from public schools and into non-public schools,[1] and that decision is now pending on direct appeal to the Louisiana Supreme Court.[2] The State Officials, as well as the majority, agree that if the state supreme court affirms the trial court's decision, this federal litigation will be moot, because in the absence of the 2012 state law there will be no diversion of public funds for private tuition or reassignment of students to non-public schools. Given that the parties challenging Act 2's constitutionality prevailed in the state trial court, there is sufficient uncertainty as to the meaning of state law (namely, whether Act 2 comports with the commands of the Louisiana State Constitution). Especially noteworthy in this regard is that the state court ruled Act 2 unconstitutional on the basis of a unique provision of the Louisiana State Constitution—one without analog in the U.S. Constitution—providing that funds dedicated jointly by the legislature and the BESE under the MFP formula for Louisiana's public-schools systems must be directed to public parish and city school boards that administer those systems and may not be diverted unilaterally by the legislature to non-public schools. *See La. Fed'n of Teachers v. Louisiana*, No. 612,733, Slip Op. at 22-34 (19th Dist. Nov. 30, 2012); *see also* LA. CONST. art. VIII, § 13(B)-(C). As stated in a noted treatise,

---

[1] *See* Lauren McGaughy, *Jindal Voucher Overhaul Unconstitutionally Diverts Public Funds to Private Schools, Judge Rules*, THE TIMES-PICAYUNE, Nov. 30, 2012, http://www.nola.com/politics/index.ssf/2012/11/jindal_voucher_overhaul_uncons.html.

[2] *See* LA. CONST. art. 5, § 5(D)(1).

25

No. 12-31218

"abstention is justified if there is a unique state constitutional provision and a state court interpretation of it could make a federal constitutional decision unnecessary."  Chemerinsky, *supra*, § 12.2, at 822; *see also Reetz v. Bozanich*, 397 U.S. 82 (1970) (abstention appropriate due to unclear meaning of unique fishing-rights provision of state constitution).

Second, adjudication of the pending state-court challenge to the constitutionality of Act 2 could render moot the need to address the petitioners' federal constitutional challenge involving Act 2, which is predicated on the district court's desegregation order under *Brown v. Board of Education*, 347 U.S. 483 (1954), and *United States v. Jefferson County*, 380 F.2d 385 (1967) (en banc), and the parties so agreed at the November 26, 2012 hearing.[3]  This is because if the state court rules Act 2 unconstitutional on the basis of the Louisiana State Constitution, the petitioners' claimed threatened harm—the State Officials' defunding of the Tangipahoa Parish school system, their authorizing reassignment of parish students to non-public schools, and their payment of such schools' tuition with MFP money pursuant to Act 2, and the resulting impediment to the school district's ability, for lack of funds, to comply with the district court's desegregation order—will vanish, thus obviating the need to rule on the petitioners' federal constitutional challenge.  For these reasons, I believe that *Pullman* abstention should be applied here; accordingly, the district court's judgment should be immediately reversed and the case remanded with instruction for the district court to abstain under Pullman.  *See Harris Cnty.*, 420 U.S. at 89 n.14 ("Ordinarily the proper course in ordering 'Pullman

---

[3] That the desegregation order was entered in a desegregation case premised on *Brown* and its progeny demonstrates the constitutional dimensions of the ruling requested by the petitioners.  *See Freeman v. Pitts*, 503 U.S. 467, 491 (1992) (describing "those provisions of the law *and the Constitution*" as "predicate for judicial intervention" by way of a consent decree) (emphasis added).

abstention' is to remand with instructions to retain jurisdiction but to stay the federal suit pending determination of the state-law questions in state court.").[4]

### 2.

Although the majority concedes that the criteria for *Pullman* abstention have been met, it wrongly refuses to apply it immediately and continues this litigation by misusing the doctrine to assist in granting the State Officials a stay of the district court's judgment pending appeal. This is double error because *Pullman* abstention should be ordered immediately when it appears that federal litigation may be an unnecessary entanglement and interference with state law; and the *Pullman* abstention criteria do not relate to the merits of the district court's injunction. Rather, *Pullman* is an independent doctrine, predicated on federalism, the avoidance of unnecessary federal constitutional rulings through abstention, and the value of allowing state courts to resolve sensitive and unique state issues first, before proceeding with federal litigation. On this basis, *Pullman* requires analysis independent from that conducted under *Nken* to decide whether to stay the district court judgment while the federal litigation continues on appeal.

Second, despite acknowledging that *Pullman* should apply, the majority erroneously concludes that the appeal may continue and that the State Officials' motion for a stay pending appeal should be granted. *See* Slip Op. at 16. The Supreme Court has instructed that when *Pullman* abstention is called for, the proper course is to remand with instruction to retain jurisdiction but stay the federal suit pending determination of the state-law question in state court. *See Harris Cnty.*, 420 U.S. at 89 n.14; *Morales*, 986 F.2d at 968-70 (reversing and remanding for further proceedings consistent with the court's instruction to

---

[4] The exception to the rule, not at issue here, is where the state "has ruled[] . . . that it cannot grant declaratory relief under state law if a federal court retains jurisdiction over the federal claim." *Id.*

abstain under *Pullman*).  Once it is determined that the *Pullman* doctrine is applicable, we lack any discretion to proceed otherwise.

Third, in connection with *Pullman* abstention we should certify the question regarding Act 2's constitutionality under the Louisiana State Constitution to the Louisiana Supreme Court.  Certification is appropriate because, even though the issue has already been appealed to the state high court our certification of it may expedite resolution of this potentially dispositive question and will serve the goals of abstention and avoidance by obviating the need to rule on the petitioners' federal constitutional challenge.  As the Court wrote in *Arizonans for Official English v. Arizona*, "*Pullman* abstention [has] proved protracted and expensive in practice, for it entail[s] a full round of litigation in the state court system before any resumption of proceedings in federal court."  520 U.S. 43, 76 (1997); *see also* Chemerinsky, *supra*, § 12.3, at 840 (noting that the procedure, followed under *Pullman* and requiring parties to litigate state-law claims in state court first, "commonly takes many years and imposed substantially increased costs on litigants").  "Certification procedure, in contrast, allows a federal court faced with a novel state-law question to put the question directly to the State's highest court, reducing the delay, cutting the cost, and increasing the assurance of gaining an authoritative response."  *Arizonans*, 520 U.S. at 76; *see also Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974) (noting that certification saves "time, energy, and resources and helps build a cooperative judicial federalism"); Chemerinsky, *supra*, § 12.3, at 841 ("Certification greatly simplifies the abstention procedure and therefore reduces the delays and increased costs usually accompanying abstention.").  Certification will expedite resolution of this case while serving important goals of our nation's federalism.  And in particular, time is of the essence when educating children.

No. 12-31218

## B. The State Officials Are Not Entitled to Sovereign Immunity from Suit in Federal Court To Enjoin Them from Thwarting and Interfering with a Valid Desegregation Order

Contrary to the majority's decision, the Eleventh Amendment does not bar the district court's enforcement of the federal consent decree and desegregation order by enjoining the State Officials from frustrating, interfering with, or threatening to dismantle those federal orders by executing a state law that sharply conflicts with the federal decrees by authorizing, *inter alia*, reassignment of public school students to non-public schools and the increasing diversion of state MFP funds away from the parish's public-school system to pay for transfer students' non-public school tuition.

As the Supreme Court held in *Frew v. Hawkins*, a case such as this "involves the intersection of two areas of federal law: the reach of the Eleventh Amendment and the rules governing consent decrees." 540 U.S. 431, 437 (2004). As the Supreme Court explained:

> The Eleventh Amendment confirms the sovereign status of the States by shielding them from suits by individuals absent their consent. To ensure the enforcement of federal law, however, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. This standard allows courts to order prospective relief as well as measures ancillary to appropriate prospective relief. Federal courts may not award retrospective relief, for instance, money damages or its equivalent, if the State invokes its immunity.

*Id.* (citations omitted). This case is not a suit for money damages or its equivalent against the State, but rather a suit for an injunction requiring the State Officials to conform their conduct to federal constitutional law as interpreted by *Brown* and its progeny and as set forth in the desegregation consent decree entered in this case in 1965 and updated by succeeding desegregation orders, the most recent being the 2012 desegregation order.

29

No. 12-31218

"Consent decrees have elements of both contracts and judicial decrees." *Id.* Thus, "[a] consent decree 'embodies an agreement of the parties' and is also 'an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees.'" *Id.* And "[c]onsent decrees entered in federal court must be directed to protecting federal interests." *Id.* In *Firefighters v. Cleveland*, the Court "observed that a federal consent decree must spring from, and serve to resolve, a dispute within the court's subject-matter jurisdiction; must come within the general scope of the case made by the pleadings; and must further the objectives of the law upon which the complaint was based." *Id.* (citing 478 U.S. 501, 525 (1986)).

Here, the State Officials do not contend that the terms of the consent decree or desegregation order were impermissible under *Brown* and *Jefferson County*. Nor do they contend that the consent decree failed to comply with *Firefighters*. Rather, the officials challenge only the district court's means of enforcement of the decree and order, not their validity or entry.

The state officials rely heavily on the Supreme Court's decision in *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89 (1984), and the Eleventh Circuit's decision in *DeKalb County School District v. Schrenko*, 109 F.3d 680 (11th Cir. 1997). *Pennhurst* and *DeKalb County,* which relies primarily on *Pennhurst*, however, are distinguishable. In those cases, the courts found the rationale of *Ex parte Young* inapplicable to suits brought against state officials alleging violations of *state-law*. 465 U.S. at 106; 109 F.3d at 688. Jurisdiction was thus improper because "[a] federal court's grant of relief against state officials on the basis of state-law, whether prospective or retroactive, does not vindicate the supreme authority of federal law." *Pennhurst*, 465 U.S. at 106. Here, by contrast, the law to be enforced is not state law but federal law, embodied in a federal consent decree and desegregation order that was entered

No. 12-31218

to implement the Fourteenth Amendment of the U.S. Constitution as interpreted by *Brown* and its progeny. This is the federal law which the State Officials have been enjoined from frustrating or threatening to dismantle.

Therefore, this case is governed by the Supreme Court's decision in *Ex parte Young* and its progeny in which the Court has striven to harmonize the principles of state sovereign immunity with the effective supremacy of rights and powers secured elsewhere in the Constitution. When a suit is brought only against state officials, as in the present case, a question arises as to whether that suit is a suit against the State itself. *Pennhurst*, 465 U.S. at 101. "Although prior decisions of [the Supreme] Court have not been entirely consistent on this issue, certain principles are well established." *Id.* For instance, the Eleventh Amendment bars a suit against state officials when "the state is the real, substantial party in interest." *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945). "The general rule is that a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.'" *Dugan v. Rank*, 372 U.S. 609, 620 (1963) (citations omitted). However,

> [t]he Court has recognized an important exception to this general rule: a suit challenging the constitutionality of a state official's action is not one against the State. This was the holding in *Ex parte Young*, . . . in which a federal court enjoined the Attorney General of the State of Minnesota from bringing suit to enforce a state statute that allegedly violated the Fourteenth Amendment. This Court held that the Eleventh Amendment did not prohibit issuance of this injunction. The theory of the case was that an unconstitutional enactment is "void" and therefore does not "impart to [the officer] any immunity from responsibility to the supreme authority of the United States." Since the State could not authorize the action, the officer was "stripped of his official or representative character and [was] subjected to the consequences of his official conduct.

31

No. 12-31218

*Pennhurst*, 465 U.S. at 102 (citation omitted). Further,

> [w]hile the rule permitting suits alleging conduct contrary to "the supreme authority of the United States" has survived, the theory of *Young* has not been provided an expansive interpretation. Thus, in *Edelman v. Jordan*, . . . the Court emphasized that the Eleventh Amendment bars some forms of injunctive relief against state officials for violation of federal law. In particular, *Edelman* held that when a plaintiff sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief. Under the theory of *Young*, such a suit would not be one against the State since the federal-law allegation would strip the state officer of his official authority.

*Id.* at 102-03. Thus, prospective injunctive relief against a state officer does not amount to retroactive relief that would be barred by the Eleventh Amendment. *See id.*

Applying the foregoing principles, it is clear that the district court's injunction of the State Officials' future unconstitutional conduct that would contravene federal law by frustrating and threatening defeat of the federal consent decree and desegregation order, based on federal constitutional law, is not a suit or an injunction against the state. Nor does the district court's injunction violate the Eleventh Amendment by granting retroactive relief against the state or any state official or by ordering the payment of any compensation for past wrongs by the state or its officers.

The majority does not disagree with the principles enunciated by the Supreme Court in *Ex parte Young* and its progeny as set forth above. Instead, the majority totally mischaracterizes the district court's injunction by incorrectly stating that it is "an award of monetary relief against the State's treasury," Slip Op. at 8; that it requires the State "to answer what is essentially a claim for contribution from one of its subdivisions in federal court," Slip Op. at 9; and that

32

"this matter does not involve a party seeking a state official's compliance with federal law that will indirectly cost the state more money," Slip Op. at 8.

A fair and accurate reading of the record demonstrates that the district court's injunction merely requires the State Officials to conform their prospective conduct to federal law as stated in the desegregation consent decree and orders; and that it does not order the state to contribute anything from its treasury or, for that matter, to do anything at all.  Indeed, because the state has not been made a party, the injunction applies only against the State Officials and orders that their "implementation of [Act 2] of the 2012 Regular Session of the Louisiana Legislature be enjoined in accordance with this Court's previous order," in which the district court stated that its injunction would apply to restrain them prospectively from frustrating the court's implementation of the desegregation consent decree and orders.

The majority's implicit argument that Superintendent White may not be enjoined under *Ex parte Young* because there is no claim that he has violated federal law or acted outside of his official capacity is without merit. The Louisiana State Constitution places general duties on him and the members of the BESE to administer Act 2 of the Regular Session of the 2012 Legislature. *See* LA. CONST. art. 8, §§ 2, 13.  Act 2 itself more specifically places a duty on them to take actions that would violate federal law by frustrating the district court's implementation of its desegregation consent decree and orders.  Under *Ex parte Young*, in making an officer of the state a defendant in a suit to enjoin the unconstitutional enforcement of a state law, the officer must have some connection with the enforcement of the act. "The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact, and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists." *Ex parte*

*Young*, 209 U.S. at 157; *see also K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010) (citing this passage from *Young*).

Finally, the cases the majority cites in support of its assertion that this is a suit against the state in violation of the Eleventh Amendment are inapposite because they are cases in which a suit essentially sought retroactive relief, or monetary compensation, against the state itself, and not prospective injunctive relief against a state official. As the Supreme Court has stated:

> [The *Young*] doctrine has existed alongside our sovereign-immunity jurisprudence for more than a century, accepted as necessary to "permit the federal courts to vindicate federal rights." It rests on the premise—less delicately called a "fiction[]"—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes.

*Va. Office for Protection & Advocacy v. Stewart*, 131 S.Ct. 1632, 1638 (2011). In the present case, that is all the district court has done, *viz.*, command the State Officials to refrain from violating federal law embodied in the desegregation consent decree and orders. Accordingly, the district court had jurisdiction to issue the injunction, and the Eleventh Amendment presented no bar.

**C. The State Officials Have Failed To Make a Strong Showing of a Likelihood of Success on the Merits Regarding the District Court's Application of the All Writs Act**

The All Writs Act, 28 U.S.C. § 1651(a), empowers "a federal court to issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction. otherwise obtained." *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977). Under the Act, a district court may issue a writ binding persons or entities that were not parties to the underlying litigation if their conduct frustrates the court's order. *See id.* at 174. As the Supreme Court has stated, "three conditions must be satisfied before [the writ] may issue":

No. 12-31218

> First, "the party seeking issuance of the writ [must] have no other adequate means to attain the relief he desires," a condition designed to ensure that the writ will not be used as a substitute for the regular appeals process.  Second, the petitioner must satisfy "the burden of showing that [his] right to issuance of the writ is clear and indisputable."  Third, even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances.

*Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380-81 (2004) (internal quotation marks and citations omitted).   Although the majority asserts that the district court lacked authority under the Act, this is incorrect.

Given the framework advanced by the majority, the State Officials bear the burden of demonstrating a strong showing of a likelihood of success on the merits that one or more of the conditions outlined in *Cheney* is missing.  *See* Slip Op. at 4-5, 11-15; *see also Nken*, 556 U.S. at 434.  The State Officials have not met this burden.  Instead, their only argument regarding the All Writs Act is that the Act "cannot serve as an independent basis for jurisdiction." *See Texas v. Real Parties in Interest*, 259 F.3d 387, 392 (5th Cir. 2001).[5]  However, no one disputes that the district court already possessed an independent basis for the exercise of jurisdiction: namely, the decades-old desegregation suit out of which the 2010 consent decree arose and is still under the district court's supervision.  Thus, the State Officials' argument misses the mark and, moreover, does not constitute a strong showing of a likelihood of success on the merits as required by *Nken*.

Given the State Officials' terse All Writs Act analysis, the majority has seen fit to supply the State Officials' argument for them.  Not only is this inappropriate under *Nken*, but the majority's arguments are also incorrect. First, the majority asserts that the petitioners possess adequate means of relief apart

---

[5] The State Officials also assert that the Act may not be "used to circumvent or supersede the constitutional limitations of the Eleventh Amendment." *See In re Baldwin-United Corp.*, 770 F.2d 328, 340 (2d Cir. 1985).  Given that the Eleventh Amendment does not bar the present suit, this observation is beside the point.

No. 12-31218

from the All Writs Act. Slip Op. at 12. The meager options the majority suggests are twofold: (1) entreat the State Legislature to either provide greater funding or repeal Act 2; or (2) rely on the pending state-court proceeding addressing the constitutionality of Act 2 under the Louisiana State Constitution. *See id.* However, and as the district court observed in its November 30 order, the pending state-court proceeding does not address compliance with the 2010 consent decree nor how Act 2 will affect Tangipahoa's ability to achieve unitary status; that issue would be beyond the scope of that proceeding. Although resolution of the pending state-court suit may moot the need for further federal litigation, this factor is addressed to *Pullman* abstention, *see supra*, *not* the first factor for invocation of the All Writs Act, which asks whether recourse to the state-court litigation will enable the petitioners to assert their claim that the State Officials' administration of Act 2 frustrates and defeats the school board's compliance with the 2010 consent decree. Moreover, given that the state trial court declined to enjoin the voucher program, timely access to relief is not available to petitioners. *See* Stephanie Simon, *Louisiana Voucher Program Ruled Unconstitutional*, The Huffington Post, Nov. 30, 2012, http://www.huffingtonpost.com/2012/11/30/judge-rules-louisiana-sch_n_222096 2.html. Regarding whether the petitioners should be required to lobby the legislature, relief from that body not only is speculative but also ignores that, absent the injunctive relief requested, the petitioners' ability to comply with the consent decree will be undermined and severely frustrated.

Second, the majority contends that the petitioners have not shown that their right to the writ is "clear and indisputable" because they allegedly rely on speculation and general financial information to show the harm that Act 2 creates. *See* Slip Op. at 12. The district court noted that the applicability of the All Writs Act in this very context (namely, allowing a federal court to enforce its consent decrees) *is* well established. Moreover, the majority's argument

impermissibly shifts the burden from the State Officials requesting a stay to the petitioners who have successfully convinced the district court that application of the All Writs Act is warranted.  The district court is in a better position, having supervised the underlying desegregation suit for decades and overseen countless hours of careful negotiations between the parties, to judge what will and will not affect Tangipahoa's compliance with the consent decree.  *See Tasby v. Black Coal. To Maximize Educ.*, 771 F.2d 849, 855 (5th Cir. 1985) (reasoning that "great deference is given to the district courts" in reviewing desegregation orders because "the district courts are best situated to understand the particular problems and needs of the districts in which they sit" and "their proximity to local conditions" enables them to "best perform this judicial appraisal") (internal quotation marks omitted) (citing *Brown v. Bd. of Educ.*, 349 U.S. 294, 299 (1955) (*Brown II*)); *cf. Spallone v. United States*, 493 U.S. 265, 281 (1990) (Brennan, J., dissenting) (referring to the district court's "intimate contact" with and "special insight" into the facts of the case and criticizing the Court for its "*ex post* rationalization" from its "detached vantage point" for disturbing the district court's calculated judgment of what would "most likely . . . work quickly and least disruptively" in the case); *see also Newby v. Enron Corp.*, 338 F.3d 467, 476 (5th Cir. 2003) (reviewing issuance of a writ pursuant to the All Writs Act for abuse of discretion).  The majority's analysis, then, robs the district court of the deference we are required to pay to the court's determination that Act 2 *is* a threat to compliance with the federal constitutionally required consent decree and unitary system conversion plan.  *See  Tasby*, 771 F.2d at 855 .

Third, the majority reasons that issuance of the writ was not appropriate under the circumstances because only one-quarter of one percent of schoolchildren in the parish are affected, *at this point in time in the first year of the voucher program.*  Again, this pays little fealty to the considered wisdom and common sense of the district court's judgment and, moreover, ignores the

determination that the number of schoolchildren participating in the voucher program, thereby abandoning the public schools in Tangipahoa and depriving them of much-needed funding, undoubtedly will increase in future. For the foregoing reasons, I do not believe the State Officials have satisfied their burden of making a strong showing of a likelihood of success on the merits regarding the district court's utilization of the All Writs Act.

### D. The State Officials Have Failed To Satisfy Their Burden of Demonstrating *All Four Nken* Factors To Justify a Stay Pending Appeal

The State Officials bear the burden of satisfying *all four Nken* factors in order to warrant a stay pending appeal. *See* 556 U.S. at 434. Despite this, the State Officials have satisfied none.

First, the State Officials have failed to make a strong showing of a likelihood of success on the merits. Even assuming that analysis under the Eleventh Amendment and *Pullman* doctrine is appropriately subsumed under *Nken*'s first factor—a contention with which I take great issue given the jurisdiction-sapping nature of affirmative answers under either doctrine—the State Officials' arguments based on the Eleventh Amendment, *Pullman*, and the All Writs Act fail to demonstrate a strong showing of a likelihood of success on the merits. Thus, the State Officials must make a strong showing in some other fashion.

In this regard, the State Officials bear the burden of strongly showing that the district court abused its discretion in granting a preliminary injunction to halt Act 2's interference with the consent decree in Tangipahoa. *See Planned Parenthood Ass'n of Hidalgo Cnty. Tex., Inc. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012). This is a high bar, one that calls for greater deference to the findings and conclusions of the district court than if we as a panel were to conduct a *de novo* review of the issues presented in this appeal. *See id.*; *Tasby,* 771 F.2d 849, 855. The district court determined, based in part on the testimony, discussions,

and evidence it considered in formulating its consent decree and unitary-school-system plan, that the operation of Act 2 in Tangipahoa would undermine or unduly impede the school board's ability to comply with the consent decree and the goal of achieving unitary status. Thus, the State Officials are obliged to make a strong showing that the diversion of MFP funding away from the public-school system and into non-public schools via the use of vouchers by schoolchildren opting out of the former to attend the latter, would not interfere with or undermine the district court's carefully crafted consent decree and unitary school system plan, which was based on projections measuring public-school enrollment and the corresponding allocation of MFP funds to Tangipahoa by the State. I particularly note that the State Officials introduced no evidence to show that Act 2's unilateral diversion of MFP funds and enrollment from public schools to non-public schools would not interfere with and undermine the district court's consent decree and unitary public school system plan for Tangipahoa public schools. They did not show—nor, I question, could they—that the diversion of MFP funding from Tangipahoa would not affect the meticulous requirements imposed on the school system, including the construction of new facilities, the improvement of old ones, new teacher-training requirements, school programs, and student assignments. Instead, the State Officials simply argued that Tangipahoa received slightly more MFP funds for the 2012-2013 school year than it received for the 2011-2012 school year. This argument did not take into account the added burdens imposed upon the Tangipahoa public system by the district court's consent decree and unitary plan in the next and succeeding years. Because of a lack of evidence and failure to acknowledge that growth in profits without accounting for added debt does not guarantee financial health, the State Officials have failed to satisfy their burden of making a strong showing of likelihood of success in reversing the district court's findings and judgment with respect to *Nken*'s first factor.

No. 12-31218

Second, the State Officials have failed to make out an irreparable injury as required by *Nken*'s second factor. Our temporary stay of the injunction on December 14, 2012 permitted the payment of the fifty children's vouchers on December 17, 2012 and the continued implementation of Act 2 in Tangipahoa. This undercuts the majority's contention that the fifty participating schoolchildren would have to relocate absent timely payments during the school year. *See* Slip Op. at 15. Further, even under the injunction's terms, the loss of vouchers by the fifty schoolchildren currently enrolled in the voucher program in Tangipahoa neither substantially nor irreparably would have injured the voucher program or the affected children. The schoolchildren would have remained entitled to free public education by the Tangipahoa school district and Act 2 would have been temporarily stopped only as to fifty students in one public-school district out of sixty-nine statewide. Therefore, even if we had not issued our temporary stay of the injunction, no irreparable injury would have befallen the state or the fifty children due to the district court's judgment.

Regarding the third and fourth *Nken* factors—whether the stay will substantially harm the petitioners and a determination of where the public interest lies—the State Officials have also failed to satisfy *Nken*'s commands. In particular, the State Officials rely solely on their assertion that the school board in fact received more funding this year than it did last year. But, as mentioned previously, the State Officials' argument fails to take into account the burdens the school system will be obligated to discharge in the future; essentially, the State Officials are reading only one side of Tangipahoa's profit-and-loss statement. Showing that neither the public interest in public education nor the Tangipahoa public school system, within the context of the consent decree and unitary plan, will be harmed by the Act 2 voucher program requires a much more complex analysis. The additional burdens on the Tangipahoa public school

40

No. 12-31218

system by the consent decree and unitary school system plan, as well as other factors such as demographics and inflation, would have to be taken into account.

The majority's attempt to minimize the harm that will befall petitioners if they are unable to comply with consent decree, as well as their assertion that *Nken*'s last two factors are "less significant" ignores that State Officials' burden in satisfying *all four* factors. *See Nken*, 556 U.S. at 434; Slip Op. at 15-16. Additionally, the district court observed that the expansion of non-public schools in and around the parish concomitant with the enactment of Act 2, as well as the likely increase in the number of students availing themselves of vouchers, would further destabilize the carefully crafted consent decree. Doc. No. 1066, at 12-13. Under the third *Nken* factor, it is up to the State Officials to demonstrate that the petitioners *will not* be substantially harmed. *See id.* It is not the role of the majority, conceding that Act 2 interferes with the school board's ability to comply with the consent decree, *see* Slip Op. at 16, to assert that Act 2 does not interfere with Tangipahoa's compliance *enough*. All this leads to the conclusion that the State Officials have failed to carry their burden with respect to *Nken*'s third and fourth factors. Based on this and foregoing, the State Officials have failed to carry their burden and thus demonstrate that a stay is warranted based on an application of the *Nken* factors.

## CONCLUSION

For the foregoing reasons, I respectfully dissent from the majority's refusal to grant the State Officials' request to order *Pullman* abstention in this case by reversing the district court's judgment and remanding the case to it for federal-court abstention; from the majority's improper use of the doctrines of sovereign immunity and *Pullman* abstention in its *Nken* analysis; from its determination that sovereign immunity bars the district court's injunction issued to restrain the State Officials from doing nothing more than violating federal law embodied in the district court's desegregation consent decree and orders; and from its

41

erroneous determination that the State Officials satisfied their burden with respect to *all four* factors under *Nken*.